## WEST PUBLISHING CO. v. EDWARD THOMPSON CO.

(Circuit Court, E. D. New York.   June 1, 1909.)

1. COPYRIGHTS (§ 86*)—INFRINGEMENT—INJUNCTION.
     An unfair saving of labor and expense by the appropriation of the copyrighted work of another, animo furandi, is ground for injunction against the infringing publication, if the unfair use permeates the work to any material extent.

     [Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 86.*]

2. COPYRIGHTS (§ 73*)—INFRINGEMENT—REMEDIES—INJUNCTION—DAMAGES.
     Where the damage by the infringement of an alleged copyright embraced only the expense of additional copying, or if the sale of the work in itself caused no unfair competition and no appropriation of literary work, then complainant would not be entitled to an injunction, but would be limited to a recovery of damages for the material appropriated or for the unjust enrichment at the expense of the copyrighted work.

     [Ed Note.—For other cases, see Copyrights, Dec. Dig. § 73.*]

3. COPYRIGHTS (§ 73*)—INFRINGEMENT—INJUNCTION.
     Injunction may be an appropriate remedy for copyright infringement, even after the copyright has expired, if the unfair taking occurred while the copyright was in force and no adequate legal remedy can be applied.

     [Ed Note.—For other cases, see Copyrights, Dec. Dig. § 73.*]

4. COPYRIGHTS (§ 33*)—RENEWAL—NAME IN WHICH MADE—STATUTES.
     Under the copyright statute, a valid renewal of copyright can be made only in the name of the author, "or his widow or children if he be dead," and not in the name of the assignee of the person or persons entitled to such renewal.

     [Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 33.*]

5. COPYRIGHTS (§ 47*)—ABANDONMENT—COPYRIGHT NOTICE—ASSIGNEES.
     The rights of an assignee of a copyright are limited to the rights originally obtained by the filing of the copyright, the assignee being bound as the original author in so far as the abandonment of the copyright or the loss of rights to the material copyrighted is concerned, by failure to follow the statutory requirements, or through a publication of such a portion of the work as may require a repetition of the statutory notice if the material is not to be released.

     [Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 47.*]

6. COPYRIGHTS (§ 39*)—MATTER SUBJECT TO COPYRIGHT—LAW REPORTING—WORK OF REPORTER.
     A law reporter's copyright is limited to the matter which is the result of his own intellectual labor, and, so far as the official reports are concerned, comprises only the syllabus and the statement by the reporter if not filed as a part of the decision; the opinion, the statement of facts if filed as part of the opinion, the arrangement of cases when printed in chronological order in an official publication, and the list of titles or index being public property, and not subject to copyright.

     [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 39; Dec. Dig. § 39.*]

7. COPYRIGHTS (§§ 69, 73*)—MULTIPLICATION OF COPIES—INFRINGEMENT—REMEDIES.
     An author's right to multiply copies and to prevent the appropriation of copyrighted material by others, granted by Rev. St. § 4952 (U. S. Comp. St. 1901, p. 3406), includes the right to recover damages where damages can be proven, and to an injunction if an appropriate or necessary remedy, as provided by sections 4967, 4970 (U. S. Comp. St. 1901, p. 3416).

     [Ed. Note.—For other cases, see Copyrights, Dec. Dig. §§ 69, 73.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
     169 F.—53

8. COPYRIGHTS (§§ 53, 83*)—INFRINGEMENT—PARAPHRASING.

Actionable infringement of copyright may consist of mere paraphrasing or avoidance of the appearance of copying while still appropriating the subject-matter, and may be proved either by internal evidence, depending on the sequence of ideas and language in such numbers as inevitably compels the conclusion that the copyrighted work was the source of the infringing publication, or by direct testimony as to the manner in which the work has been done.

[Ed. Note.—For other cases, see Copyrights. Cent. Dig. § 51; Dec. Dig. §§ 53, 83.*]

9. COPYRIGHTS (§ 51*)—UNFAIR COMPETITION—INFRINGEMENT OF COPYRIGHT DISTINGUISHED FROM UNFAIR COMPETITION.

While a similarity may be traced in the principles on which actions for infringement of copyright and for unfair competition are founded, copyright is based on statute, while unfair competition, except as affected by legislative enactment in connection with patents, trade-marks, etc., is dependent on abstract principles of law. Copyright relates to the printed material of a publication, while unfair competition may be concerned with any article of trade, whether having words or letters in its composition and appearance or not.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 51.*]

10. COPYRIGHTS (§ 12*) — ARRANGEMENT OF OLD MATERIALS — COMBINATION IN NEW FORM.

An author is entitled to copyright where he has taken existing materials from sources open to all writers and arranged and combined them in a new form, if he has exercised skill and discretion in making the selections, arrangement, and combination, and has presented something new and useful; the author under such circumstances being entitled to the protection of his plan of arrangement, though his copyright cannot prevent others from using the old material under the rule that a new and different use of old material is not an infringement.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 15; Dec. Dig. § 12.*]

11. COPYRIGHTS (§ 57*)—INFRINGEMENT—EXTENT.

To constitute an invasion of a copyright it is not necessary that the whole work should be copied, nor even a large portion thereof, in form or substance, it being sufficient that so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially and to an injurious extent appropriated by another.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 53; Dec. Dig. § 57.*]

12. COPYRIGHTS (§ 56*)—INFRINGEMENT—USE OF COPYRIGHTED MATERIAL.

A subsequent writer may be guided by earlier copyrighted work, may consult the original authorities, and may use those which he considers applicable in support of his own original text, without being guilty of infringement.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

13. COPYRIGHTS (§ 83*) — INFRINGEMENT—EVIDENCE—EXHIBITS—CONCLUSIONS OF EXPERTS.

In a suit for infringement of copyright, complainant inserted in parallel column exhibits certain comments, calling attention to the points of similarity and in most instances setting forth conclusions with respect thereto. Defendant also introduced answering exhibits, in series, to substantially each particular paragraph, inserting similar comments or conclusions. *Held*, that though such conclusions and arguments could not be taken as testimony, the examination of the publication by an expert could properly be accepted if the facts found were the subject-matter of the testimony and the findings could be fairly tested, so that the addition of such conclusions and arguments was not ground for the exclusion of

the exhibits, but would be considered in reading the record like statements in the briefs.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 83.*]

14. COPYRIGHTS (§ 57*)—INFRINGEMENT—"COPYING."

The term "copying," when used with reference to infringement of copyrighted legal publications, includes not only paraphrasing, but also the appropriation of the literary work, labor, and ideas of another, which includes arrangement and selection as well as mere language.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 53; Dec. Dig. § 57.*]

15. COPYRIGHTS (§ 56*)—INFRINGEMENT—LEGAL PUBLICATIONS—UNFAIR USE.

Where defendant, in the preparation of the Am. & Eng. Enc. Law (2d Ed.) and the Enc. Pl. & Pr., availed itself of the use of complainant's copyrighted syllabus and digest paragraphs without original digesting or renoting of citations, such use constituted an infringement, though the material and the several citations and paragraphs made use of could have been properly obtained by original work at the expense of greater effort.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

16. COPYRIGHTS (§ 73*)—INFRINGEMENT—EQUITABLE RELIEF.

Where an infringing publication had become no longer a salable book, being entirely superseded by later works at the time suit for infringement was instituted, complainant was not entitled to an injunction nor to an accounting of damages as an incident to equitable relief, complainant's remedy at law being full and adequate.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 73.*]

17. COPYRIGHTS (§ 73*)—INFRINGEMENT—INJUNCTION—ACTION FOR DAMAGES.

Where a subsequent writer takes an earlier copyrighted work merely as a convenient and cheap method of transcribing his original material, or uses printed lists of words or names to make clear and legible copy, and it is affirmatively shown that the entire subsequent work is original on the part of the subsequent writer, with the exception of the saving in handwriting or stenographic preparation of that material, the remedy of the original copyright owner, whose work is thus taken, is not by injunction; but he is entitled to damages for the mere mechanical saving, if such mechanical use or saving could be brought within the term "unfair use," although it would not amount to literary piracy.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 73.*]

18. COPYRIGHTS (§ 56*)—USE OF COPYRIGHTED MATERIAL—LEGAL DIGESTS.

Law writers may consult copyrighted digests to obtain clues to the contents or holdings of the various cases as a means of locating the cases relating to a particular subject and, subject to verification, to collect the cases cited, and to classify them under the same legal head, without being guilty of infringement, if the literary work or arrangement of the digests is not thereby appropriated.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

19. COPYRIGHTS (§ 74*)—INFRINGEMENT—WHAT CONSTITUTES—EQUITABLE RELIEF.

The owner of a copyrighted legal digest is not entitled to equitable relief against another publication, solely because the writer of the latter saved stenographic or manual handwriting by cutting or copying the words of the citations from the digest, where no literary ability is appropriated in the arrangement or collection of the cases themselves.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 74.*]

20. COPYRIGHTS (§ 56*)—INFRINGEMENT—USE OF DIGESTS.

Where a legal writer has formulated a proposition of text, his direction to his stenographer to add the citations shown by all of the copy-

*For other cases see same topic &.§ NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

righted digests does not constitute infringement, if he has previously verified the digest citations and found them to be correct.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

21. COPYRIGHTS (§ 56*) — LEGAL PUBLICATIONS — DIGEST PARAGRAPHS—HEADNOTES—INFRINGEMENT.

Use of copyrighted digest paragraphs and syllabus headnotes by a law writer, after he has verified them, in the official publications or in works as to which rights of copyright have been lost, is not an infringement.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

22. COPYRIGHTS (§ 86*)—INFRINGEMENT—INJUNCTION—SCOPE.

Where some substantial use of copyrighted material is shown, an injunction against the entire publication will be granted, unless the defendant can affirmatively justify its work as to particular portions of the books complained of, and thus except from the decree such articles or volumes as are affirmatively freed from the accusation of infringement.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 79; Dec. Dig. § 86.*]

23. COPYRIGHTS (§ 83*)—INFRINGEMENT—LEGAL PUBLICATIONS—EVIDENCE.

Evidence *held* to justify a finding that the entire Am. & Eng. Enc. Law (1st Ed.) and certain of the articles in the Am. & Eng. Enc. Law (2d Ed.) and Enc. Pl. & Pr. infringed antecedent digest copyrights in so far as the use of the material was concerned.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 83.*]

24. COPYRIGHTS (§ 52*)—INFRINGEMENT—INTENT OR PURPOSE.

While defendant corporation, in a suit for infringement of copyright, is responsible for the results published, and cannot avoid such responsibility by a claim that it did not intend to do wrong, the efforts which it made to avoid infringement may be considered in determining whether equitable relief should be granted because of the unwitting profit and use which was gained from the insertion of material which violated the rights of others, in spite of defendant's efforts to prevent such result.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 50; Dec. Dig. § 52.*]

25. COPYRIGHTS (§ 83*)—INFRINGEMENT—SCOPE—EVIDENCE.

Where, in a suit for copyright infringement, the identity of a few errors, which would certainly have been detected if original work had been done, appeared, and there was evidence showing a similar method of editorial work for the entire infringing publication, the court, in the absence of evidence to the contrary, should find that the entire practice and method of writing was improper, and enjoin the sale of the entire publication.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 76; Dec. Dig. § 83.*]

26. COPYRIGHTS (§ 15*) — LEGAL PUBLICATION — PARAPHRASED STATEMENT OF OPINION.

Digest and syllabus paragraphs, stated in language substantially to be found in an official opinion of the court, are only subject to copyright so far as they vary from the statement of the point as contained in the original source.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 15.*]

27. COPYRIGHTS (§ 56*)—LITERARY WORKS—"UNFAIR USE."

Since any person may obtain from a copyrighted legal digest, text-book, or other publication, a list of cases with the appropriate clues to what those cases held, the classification of a series of citations and notes which, when completed, resembled the arrangement in the copyrighted digests

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and in the making of which some assistance had been obtained from the use of such digests, did not constitute an unfair use.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 56.*]

28. EQUITY (§ 330*)—BILL—WAIVER OF OBJECTIONS—MULTIFARIOUSNESS.

Where proper equitable jurisdiction on various grounds had been shown, and the defenses alleged were applicable to the allegations as pleaded, and the entire issue was tried, argued, and submitted for decision on the merits without the defense of multifariousness being raised by demurrer, as it could have been, the defense was waived in a case where infringement of several thousand copyrights was alleged in one bill.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 663; Dec. Dig. § 330.*]

29. COPYRIGHTS (§ 83*)—STEPS TO OBTAIN—EVIDENCE—CUSTOM.

Evidence *held* to show a custom and course of business by a publisher, from which it would be necessarily presumed that, except in occasional and unintentional instances, the requirements of the copyright statute were properly observed and the necessary acts performed to secure to the publisher the copyrights intended.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 83.*]

30. COPYRIGHTS (§ 40*)—ABANDONMENT.

A copyright is abandoned if the owner licenses the publication of the material by another under a new copyright.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 35; Dec. Dig. § 40.*]

31. COPYRIGHTS (§ 40*)—ACQUISITION—ABANDONMENT.

A copyright on the language of the headnotes, digest paragraphs, and the index blackletter lines of a legal publication, and the entire material of digest advance sheets put out by a law publisher, was abandoned by the publication of the copyrighted pamphlet numbers in advance of the completed volume where such volume did not carry the original copyright notices.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 40.*]

32. COPYRIGHTS (§ 29*)—MERGER OF COPYRIGHT MATERIAL—NOTICES.

Where copyrighted material originally published in pamphlets is thereafter combined in a bound volume, such volume, in order to protect the copyright, should disclose the date of the copyright on each pamphlet to set in operation the period of exclusive enjoyment.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 29.*]

33. COPYRIGHTS (§ 29*)—ACQUISITION—"EDITION."

Where a legal publication consisting of digest paragraphs is copyrighted, an "edition" of the book should be held to consist of any divisible part of which the copyright could consistently be entered by itself, though, from the standpoint of an individual paragraph, a subsequent "edition" would consist of any such portion of the book as might be consistently held suitable for a copyright, if it included the paragraph in question; thus, while no one paragraph, when reprinted in a different volume, would in itself be considered a different "edition" of the entire original volume, nor would an entire subsequent volume be considered an "edition" of some one paragraph in an earlier copyrighted publication, yet, if any appreciable portion is republished indicating the use of the material of the earlier publication in a later work, the later work must carry a notice of the earlier copyright.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig § 29.*]

34. LITERARY PROPERTY (§ 1*)—OWNERSHIP.

The common-law right of property in literary material is superseded by the right of copyright conferred by Rev. St. § 4956 (U. S. Comp. St. 1901,

p. 3407), providing that no person shall be entitled to a copyright unless he shall deliver or deposit a printed title and two copies of such copyrighted book, etc.

[Ed. Note.—For other cases, see Literary Property, Dec. Dig. § 1.*]

35. COPYRIGHTS (§ 36*)—EXTENT OF RIGHT.

The extent of the right of copyright is that defined by Rev. St. § 4952 (U. S. Comp. St. 1901, p. 3406), namely: "The sole liberty of printing, * * * publishing, * * * copying, * * * or of vending the same," or of "multiplying copies."

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 37; Dec. Dig. § 36.*]

36. COPYRIGHTS (§ 40*)—LICENSE TO PUBLISH—ABANDONMENT.

The giving of license rights to publish copyrighted material is in the nature of a sale of the labor represented thereby, and constitutes an abandonment of the exclusive right of publication, unless the terms are such as to insure an insertion of the appropriate copyright notices whenever the use by the licensee approaches the extent of what would be considered an "edition."

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 35; Dec. Dig. § 40.*]

37. COPYRIGHTS (§ 75*)—INFRINGEMENT—DEFENSES.

In an action against a corporation for infringement of copyright, it was no defense that defendant instructed his editors to avoid generally the use of copyrighted material if, in spite of such instructions, a greater or less use was made thereof.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 75.*]

38. COPYRIGHTS (§ 83*)—INFRINGEMENT—GOOD FAITH—UNFAIR USE—EVIDENCE.

Where defendant, in preparing its legal publication, used complainant's digest paragraphs, the fact that defendant's editors and revisers struck out all citations and references to complainant's publication wherever the citation from the official reports could be substituted, and the material thus attributed to another source, in the form in which it was used was exclusively complainant's property, such evasion was sufficient to raise an inference against defendant's good faith, and that its use of the material was unfair unless complainant's rights had been lost or abandoned.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 83.*]

39. EQUITY (§ 67*)—ESTOPPEL (§ 90*)—DEFENSES—LACHES—ACQUIESCENCE.

The defense of laches involves a negative course of action while the defense of acquiescence is affirmative.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 192; Dec Dig. § 67;* Estoppel, Cent. Dig. § 242; Dec. Dig. § 90.*]

40. COPYRIGHTS (§ 80*)—INFRINGEMENT—DEFENSES—LACHES—ACQUIESCENCE.

In 1893 there was some discussion between complainant's directors over a suspicion that defendant was using complainant's copyrighted material, but an examination did not then reveal sufficient misuse of the material to justify action. In 1900 complainant acquired information which led to a determination to make a further investigation, which, in 1902, resulted in the bringing of suit, following soon after a decision in similar litigation between certain other concerns in which defendant's infringement was disclosed. It also appeared that defendant's use consisted largely of paraphrasing or an adaptation by mental recollection of complainant's material without a clue as to the source of the material. *Held*, that complainant was not barred from obtaining relief either by laches or acquiescence alone.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 80.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**41. COPYRIGHTS (§ 73*)—INFRINGEMENT—REMEDIES—INJUNCTION—ACCOUNTING —ACTION FOR DAMAGES.**

Where, in an action for infringement of copyright, it appeared that complainant's copyright on a large part of the material used had been abandoned or lost, and that much of the material used could have been lawfully obtained from other sources without infringement, so that the amount of actionable infringement was small in comparison with the whole quantity of matter, and an adequate remedy at law existed for any damages which could be proved, an injunction and an accounting of profits should be denied.

[Ed. Note.—For other cases, see Copyrights, Dec. Dig. § 73.*]

In Equity. Bill by West Publishing Company against Edward Thompson Company to restrain defendant from infringement of complainant's copyrights and for accounting for profits. Bill dismissed, without costs.

See, also, 151 Fed. 138; 152 Fed. 1019.

William B. Hale (Edmund Wetmore, and Henry E. Randall, of counsel), for complainant.

Walter Large (Frank P. Prichard, John L. Hill, and William M. McKinney, of counsel), for defendant.

CHATFIELD, District Judge. The complainant is a corporation organized under the laws of the state of Minnesota, which conducts, at St. Paul, in that state, a business of large extent, embracing all steps in the preparation, editing, publishing, printing, and distributing of law publications, in the nature of reports, digests, text-books, and kindred works of that character. The present corporation was organized upon the 1st day of November, 1882, and succeeded to the rights of a partnership known as the West Publishing Company, which had been formed in 1879, to conduct the business of John B. West & Co., founded in 1874, in St. Paul, Minn.

The present officers have been in control of affairs for some years. One of them, Mr. Charles W. Ames, joined the company in 1883, became general manager in the year 1899, and vice president in 1903. His connection and duties with the complainant bear directly upon some of the questions in this action. The treasurer, Mr. H. P. Clark, has been with the company since 1892, and the editor in chief, Mr. Henry E. Randall, since 1887.

Not only the officers but the men in charge of the work at St. Paul have acquired large experience and gained great proficiency in carrying on the various branches of the work conducted by the corporation. The staff of editors or writers, all connected with the legal profession, are shown by the testimony in the case to have acquired, by practice and training, an experience and ability which is peculiarly useful in the work which they have to do. This, of course, inures to their advantage, by giving them proficiency in what is a limited and special field of legal work. But, further, the results of the labor of such a force, when employed by a company of such capacity and enterprise, have produced an invaluable list of publications, consistent-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ly comprehensive and complete in execution, as well as continuous and progressive in scope.

It will be necessary later to take up these various publications in detail, both as to subject-matter and chronology. But it may be said generally that the publications of the West Publishing Company, so far as an examination of them is necessary in this case, comprise the opinions of the courts of this country in litigated cases, with complete digests covering these reports. These reports and digests consist of whole editions and successive books, for the entire period up to the time of publication, with separate portions, issued monthly or yearly, as the case may be, bringing each of the branches of the field down to date, and containing the decisions from year to year throughout the courts of the entire country.

The defendant corporation was organized in 1887, by one Edward Thompson, who was its first president, and who continued controlling a large portion of its stock until, in the year 1897, Mr. James Cockcroft, Mr. William M. McKinney, Mr. David S. Garland, Mr. John W. Hiltman, and Mr. Charles W. Dumont acquired a large holding in the corporation, since which time Mr. Cockcroft has been president, and Mr. McKinney and Mr. Garland have held office and acted as editors with respect to different publications, Mr. Hiltman has been manager, and all four have been actively engaged at all times in the conduct of the business. Mr. Dumont's interest was purchased by the other four in the year 1900.

The Edward Thompson Company was organized to accomplish a peculiar purpose, and to produce a product which it was believed, and as events have proved, was rightfully calculated to have a wide sale, and be of great assistance to the legal profession and to the courts.

As is known to practically every one in the law, the digests contain, according to certain classifications, statements of the holdings of all cases decided within the period of the digests' résumé and within their scope. If a certain field is covered by an annual digest, the lawyer in his search for authorities must follow down and examine all of the kindred titles and subjects, in all of the digests, for every year, unless these annual digests have been combined in some form of general digest covering an entire period. But, even if that digest is at hand, in many instances search must be made for decisions of different jurisdictions, and from different courts, necessitating not only an examination of every digest in a certain class, but of every digest in the various different jurisdictions.

The plan of uniting as many annual and limited digests as possible under one comprehensive publication, or in a series of volumes under one alphabet, has been and has continued to be carried on by the complainant corporation, as a part of its particular work; but no digest can set forth deductions or conclusions from, nor draw comparisons between, the ideas suggested by the cases examined. Nor can any set of books made up of extracts, giving the substantial and important points of every case, be confined within the limits of a workable series of books, and be serviceable for the quick ascertainment of principles, and the peculiar advantage of the product of skilled thought, such as,

in any particular branch of the law, had previously been supplied by text-books and works of that character. But no series of text-books, on the contrary, had covered the entire field of law, as text-books rapidly pass out of date and other text-books take their place. Even as to particular subjects, and in recent works, a lawyer running down a point would not find in the text-book any satisfactory or complete list of all the cases in the particular jurisdiction under examination, nor of the variations and different holdings, from time to time, in that jurisdiction, unless they happened to be illustrative of general principles important enough to be included in the limited field of the text-book writer's statements and conclusions. The legal profession was therefore ready, and the immense increase in litigation, through the expansion of business, had created a demand, for a book giving to every one the complete field of the law upon all subjects in jurisprudence, together with the course of decision in each division of the field; and to have this comprehensive work presented in the form of citations or lists of all cases, as well as a statement of conclusions and comparative deductions, from which principles of law of a reliable and trustworthy character could be quickly referred to. This particular need was met, to a considerable extent, by what has come to be known as the "Encyclopedia," of which there are now several (not all completely comprehensive in scope), and the particular editions and names of which must be taken up further on in this opinion.

The testimony shows that the originator and first worker upon the form of book which will hereafter be called the "Encyclopedia" was Mr. James Cockcroft, who began the preparation of this series of books about the year 1886. He wrote or supervised the first volume of the series for the publication of which the Edward Thompson Company was organized. The ability to digest cases, and to state concisely the important holdings of these cases, must have added to it an ability to properly compare, contrast, and apply the results of such digesting, followed by the constructive, and more or less literary, task of weaving the result of these conclusions into an article, as short as possible, and as clear and exact as the statements of a text-book, upon the point under discussion. The preparation of the great number of articles in such a book required, and requires, the work of a large force, including the responsible writers, who actually perform the functions above recited.

The defendant corporation has maintained at Northport, Long Island, in this district, a plant and publication house, in which its books have been prepared and published, and in connection with which the greater part of the compilation of material, and the work of its editorial or writing force, has been done. Experience and ability, coupled with practice in such editorial work, not only produces better results from the standpoint of quality, but, of course, enables more rapid work, thus bringing the books more closely up to the time of publication, decreasing expense, and increasing the compensation of the experienced worker.

The Edward Thompson Company has employed many men who have gained their experience in its own service, and also many men

who have worked for the complainant. It is particularly to be noticed that many writers on the defendant's publications had at some time been employed by the complainant, while nearly every writer whose testimony is relied upon by the complainant, as well as witnesses now connected with other publishing concerns evincing interest in this litigation, and even some of the counsel in the case, had worked for the defendant company. In many instances feeling has been engendered, or the present activities and sympathies of the witnesses are enlisted on behalf of the complainant, or a corporation controlled by those who have taken some apparent interest in the complainant's side of the suit.

In view of this fact, most of the statements of these witnesses with relation to the work which they did for the defendant company have been brought out by the complainant in the form of testimony attacking the methods of that work, and the legal invulnerability of the product of their own services to the defendant, from the standpoint of the alleged violated rights of the complainant.

The testimony of such witnesses, even though produced under subpœna, must, if it bears any imprint of personal character at all, be in the nature of an admission, which, coupled with the implication of wrongdoing, is open to the suggestion of bias or animosity, or of more or less uncertainty and evasiveness by those who, under compulsion, are thus called upon to lay open their own work and methods to criticism and attack.

But, on the other hand, the defendant's witnesses have in some instances been actuated by a certain degree of feeling, and have been prone, because of the attack made upon their methods, to deny the complainant's charges, to an extent greater than they might do if they were entirely certain that an exact statement of the transactions would not result in an unconscious and undesigned trespass upon the complainant's property, as set forth in this action.

The testimony of several of the witnesses, showing the existence of working rules and carefulness to avoid anything which might appear like copying of the language from copyrighted publications, indicates a general appreciation of the necessities of strict avoidance of trespass; and the care with which proof was examined, articles read over, and extracts and citations compared, shows, on the part of the responsible agents of the defendant, a careful attempt to see that their instructions were carried out. But the testimony of many witnesses indicates that the position taken by the complainant, in asking for a decree in this action, was neither recognized nor apprehended to be the law by those responsible for the defendant's publications, nor by the men who were performing the work, and for whom the defendant must as well be held responsible.

It appears from the testimony that Mr. James Cockcroft, in writing the first volume of the Encyclopedia, made use of digest paragraphs, so-called, in writing his text, and making up the citations added thereto in the form of notes. It is apparent that many other writers used digest paragraphs, with care to avoid copying of language, but with the idea that conclusions reached by the aid of the digest paragraphs, when verified either as to language or thought, could be properly re-

tained, and could be employed in the construction of the Encyclopedia article, with as much freedom as would be used by a judge in writing an opinion, or by a lawyer in making up a brief. In fact, in the Encyclopedia published by the defendant, citations and quotations obtained from the digests, which likewise could be found in the official reports, appear to have been copied from the digest paragraphs, and, if verified, ascribed to the official reports, without the formality of an additional ascription to the digest or the complainant's reports, and without going to the point of disregarding the digest paragraphs or classification of the case until after the original case had been read and worked into the Encyclopedia article.

The complainant seeks to show a fundamental limitation in the use which can be made of the contents of a text-book or a digest by any writer constructing a book for commercial purposes, and draws a close analogy between the present case and those cases in which the copyright of a dictionary, directory, or map has been held infringed by the publication of another work of the same sort, which had been constructed by the verification and reformation of the prior work, instead of by compilation of original material. A number of these cases are cited, such as Kelly v. Morris, L. R. 1 Eq. 697; Spiers v. Brown, 6 W. R. 352; Cary v. Kearsley, 4 Esp. 168; Wilkens v. Aiken, 17 Ves. 424; Gray v. Russell, 1 Story, 11, Fed. Cas. No. 5,728; Trow Directory, etc., Co. v. U. S. Directory Co. (C. C.) 122 Fed. 191; Chicago Dollar Directory Co. v. Chicago Directory Co., 66 Fed. 977, 14 C. C. A. 213; List Pub. Co. v. Keller (C. C.) 30 Fed. 774; Hartford Printing Co. v. Hartford Directory & Pub. Co. (C. C.) 146 Fed. 332; Williams v. Smythe (C. C.) 110 Fed. 961. And the courts have held in each instance that an unfair saving of labor and expense, by appropriating the work of another, which appropriation is said in the opinions to be animo furandi, should be the basis of recovery, and that the publication of such an unfair work will be enjoined, if the unfair use permeates the work to any material extent.

It is apparent that a map or a directory, which is merely a new edition, or what would be equivalent to a new edition, if gotten out by the same parties, is merely an attempt, on the part of those responsible for the publication, to obtain the market, and take away the rights of the persons selling the older book. It is not competition, but is larceny of a certain sort, and the distinction between such use and fair use can be readily seen. But if the person preparing a new book or map should go out through the district and make original surveys, and jot down the result of those surveys, using the old map merely as a check or convenient tablet for memoranda, or if, in the case of a directory, the canvasser should go, street by street, to all of the addresses to be included, but should use the printed pages of the old directory as a pad or tablet, rather than to write out the names therein contained in longhand, no literary work would be saved, no literary property would be taken away, and no injury inflicted, except the monetary damage caused by the saving of a certain amount of copying in the preparation of the new work, thus making the new work that much cheaper, or that much easier of accomplishment.

If infringement and unfair use of such a directory or map be shown, an injunction would be the only appropriate remedy while demand for the work existed. But if the extent of the damage could be shown to have been merely the expense of additional copying, or if the sale of the work in itself caused no unfair competition, and no appropriation of literary property, then injunction would not lie, but damages for the material appropriated, or damages for the unjust enrichment at the expense of the copyrighted work, would be the more appropriate remedy, as the legal remedy would be sufficient.

Reference will be made again to this point in connection with the expiration of copyright, inasmuch as it would appear that injunction may be an appropriate remedy, even after the expiration of a copyright, if the unfair taking occurred while the copyright was in force, and if no adequate legal remedy could be applied.

The complainant has raised the question of unfair use; that is, of infringement with reference to the entire publication of the books in question, up to the time of suit, upon the charges (1) of copying, in certain instances; (2) of the use of copyrighted material in the formation of systems of arrangement and plans of treatment; and (3) in the mechanical or physical use of copyrighted material as the subject matter of dictation and compilation.

In other words, the complainant in general charges that its copyrighted works have been copied, in some instances verbatim, in other instances with some verbal changes, intended to deceive and cover up the copying; that the defendant has physically cut up and made use of, as notes or copy, its copyrighted paragraphs from digests and other publications; that it has assorted and arranged these printed paragraphs, after being cut out, in an analysis and arrangement, which of itself followed the alleged copyrighted analysis of the complainant; that it has made use of ideas and statements contained in these copyrighted paragraphs, in order to gain knowledge and to form conclusions as to the holdings of the cases from which the paragraphs were originally deduced; that it has used the knowledge so gained, and even used the printed paragraphs so cut out, in the writing, dictation, and even copying of text articles, where the writer's work, and that of his stenographers, was shortened, made easier, and less expensive, than by recourse to the original opinions; and that the extent of these various acts has so permeated all of the books published by the defendant prior to the beginning of the suit that they not only cannot be definitely located, and the amount of damage caused thereby ascertained, but, on the contrary, that their use has been so material as to vitiate and taint the whole publication, even including the work of those writers who are shown to be free from any ground of criticism whatsoever.

It is the complainant's contention that the defendant, upon the showing made by the complainant, must affirmatively relieve its works, or such parts of its works as can be separated, from the effect of the accusation, and that unless divisible portions, or particular volumes, which are free from criticism, have been shown by the testimony, the complainant should be granted injunctive relief against the entire work.

The defendant, on the other hand, has denied the bald copying of paragraphs, and has explained its methods, its instructions, and its care, in an attempt to negative this charge, unless it be as to immaterial portions. The defendant further asserts that such use as it did make of the complainant's books was legitimate, and cannot be made the basis of even claims for damage. These issues must be examined carefully.

But the defendant has gone further, and has charged that the use alleged by the complainant, in the methods of working from digest paragraphs cut out of the copyrighted books of the complainant, where recourse is had to the original authorities, to obtain verification and amplification of the point stated, even if the digest paragraph be thereafter kept as the memorandum and statement of the authorities thus examined, is not actionable, for reasons which will be referred to at greater length later on.

The defendant has, further, attacked the copyrights alleged by the complainant to be valid, pointing out in certain instances inaccuracies in the records, and mistakes or omissions in complying with the statute; in other instances, expiration of the copyright, and failure to procure copyright at the outset; in other instances it is charged that the copyright has been lost or forfeited by premature publication of parts of the whole, and by licensed publication of the same material, or of parts thereof, by third parties, without repetition of the copyright notices claimed to be required by statute; and in many instances loss of copyright protection through the use of the copyrighted material in various forms by the complainant itself, in publications which are alleged by the defendant to be later editions, and in which notices of the copyrights are claimed to be necessary.

The defendant has also attacked the interest and motives, not only of the several witnesses, but of the parties by whom these witnesses are employed, and by whom their testimony is apparently produced or made possible in the present action.

It is charged that the results of the sale of the Encyclopedia have caused the coalition of interests between the complainant's and another Cyclopedia or publication competing with that of the defendant, and that the present action is not purely one for damage, nor for the protection of the complainant's rights, but to indirectly remove the defendant from the field of competition with the rival publication, in which it is charged that the complainant is interested, and whose sale they are endeavoring to enhance through injury to the defendant, under the guise of protection of the complainant's copyrights and books.

The defendant has also alleged laches on the part of the complainant, and failure to begin an action within a reasonable time after the question of possible infringement had been raised, in such a manner as to bring it to the complainant's notice. The complainant is also charged with contributory, or what might be called acquiescing, infringement, in that it has sold advertised copies of the defendant's own publications, in its general sale of law books at various periods.

The issues also involve, especially in connection with the question of copyright, the joinder of an apparently large number of separate

causes of action, if these causes of action be valid, inasmuch as each book copyrighted or published by the defendant has by itself raised the issue above set forth, with respect to a great number of the copyrights claimed by the complainant. The distinction between damages at law, and rights to an injunction in equity, must be borne in mind; and this question of joinder of the rights existing from separate breaches or invasions of the complainant's copyrights must be determined in considering the possibility of equitable relief, if legal injuries at different times have been satisfactorily shown.

It will be necessary, having thus stated the issues to be determined, to consider the publications of the complainant, and the form in which copyrights have been taken out, then to notice the dates of the publication and the order of preparation of the defendant's works, to compare with these the publication of the same or similar material in allied or licensed books, and thus to determine the scope of the suit, before taking up a discussion of the merits of any particular question, or the cases applying thereto.

The various publications which have been copyrighted, and as to which the validity of the copyrights has been called in question by the answer, were issued, not only at different intervals during a number of years, but also in many different portions or numbers, and in some cases with the same subject-matter, included in different arrangements, in more than one of these publications. These various works comprise, as has been said, reports in volumes, pamphlets or advance sheets, collections of cases, and digests of different sorts, including annual and general digests, as well as those confined to a certain set of reports. The complainant has furnished as well various collections of selected material or paragraphs to other publishers, and to customers who have used this material in their own works under some form of license.

The defendant, since the first volume of the Encyclopedia was issued, has published and copyrighted, at various times, a complete set of the A. & E. Enc. Law (1st Ed.) and a complete edition of the Enc. Pl. & Pr., and up to the time of bringing the action at bar, the A. & E. Enc. Law (2d Ed.) down to and including volume 23.

It will be convenient to make a table of these different publications of one sort and another, both from the standpoint of the complainant and of the defendant, and to include in this table dates of beginning each publication, for the purpose of tabulating the material about which the issues must be considered, and at the same time making it possible to compare the dates thus determined, the expiration of the various copyrights, and the books in existence and available at the the time any particular volume in the suit was in course of preparation.

This table will also be of advantage in passing upon the questions raised as to the validity of the various copyrights, and of abandonment in some instances, as well as in considering the defense of laches, in so far as that defense is based upon the existence and availability of the volumes to which the defense is alleged to apply.

In speaking of the licenses granted for the use of material contained in, and already copyrighted in the books of the complainant, and in connection with the purchase by the complainant of some of the ear-

lier publications, it must be borne in mind that at all the times involved in this action the right to a further extension of the life of any particular copyright, through refiling or registering, has been confined to the author, "or his widow or children if he be dead," and the rights of an assignee are confined to the limits of the rights originally obtained by the filing of the copyright itself, and that assignee is bound in the same way in which the original author was bound, in so far as the abandonment of the copyright or the loss of rights to the material copyrighted may occur through a failure to follow the statutory requirements, or through a publication of such a portion of the work as has been or may be held to require a repetition of the statutory notice, if the material is not to be released to the use of any one coming thereafter.

The decisions of the courts in the form of opinions, preceded by statements of fact, and by a digest or syllabus of the important points of the decision, have long been published in authorized reports, or in volumes compiled from the decisions of the courts themselves. The general method of publication has not varied greatly in the United States since the establishment of courts in the various states, and is similar to the form of such reports in use in England for a long time prior to the formation of the United States government, and the adoption of the federal Constitution.

But in the United States no general system of reports existed, and no one publication, nor series of publications, attempted to cover more than the particular court whose opinions were compiled by the reporter editing the volumes in question. Some of these series, such as the reports of the Supreme Court of the United States, have been carried on unbrokenly, in an official publication, until the present time. In most of the states the decisions of the highest and many of the lower courts have been published officially by a reporter, under the authority of the state, and registered under the copyright statute of the United States, thus protecting the material included in the volumes, in so far as the same could be copyrighted, but leaving the benefit to the person obtaining the copyright, as a matter of adjustment and contract between him and the commonwealth authorizing his work.

No question has been raised that the opinion of the court and the official statement of facts, when made a part of the opinion as filed, are open to use by the public, and are in no sense the private property of any individual. In so far, also, as the arrangement of cases is concerned, when printed in chronological order in an official publication, the list of titles or index is also public property, and the only portion of the official reports which is subject to copyright in the name of an individual is the syllabus or statement by the reporter, whether that reporter be a judge or another person, and any statement of facts produced by original work, and not filed as a part of the decision by the court.

The opinions and decisions of inferior courts have, from time to time, been published in various forms, sometimes in a series authorized by the state, sometimes as a matter of private enterprise on the part of members of the bar, and sometimes in a semiofficial form, by some firm which has combined private enterprise with a recognized and

admittedly authentic and complete series of cases in the jurisdiction covered by the work.

Into this field of official and private or semiofficial reports, the complainant corporation entered, some years after its organization, with the publication of volume 1 of the Northwestern Reporter, on January 23, 1880, followed by the first volume of the Federal Reporter on the 2d day of August, 1880. These publications have continued in series until the present time—in the case of the Northwestern Reporter, comprising the decisions of the various courts of that portion of the United States in which St. Paul, the place of publication, was located; and in the case of the Federal Reporter, containing the decisions of the United States courts, below the Supreme Court of the United States, down to the present time. By degrees various series of reports have been added, until at the present time, and at the time of bringing the present action, the different reporters published by the complainant contained all of the decisions of the United States courts below the Supreme Court, the courts of last resort of the various states, and, in some states, other courts of record, which last class is illustrated by the New York Supplement, which began with volume 1 on the 12th of June, 1888.

In addition to these Reporter series, now covering the entire field, a set of 30 volumes was printed and registered, from the 16th day of February, 1894, to the 26th day of April, 1897, known as "Federal Cases," in which were collected the opinions, statements of fact, and syllabus paragraphs of all cases decided in the lower federal courts prior to those contained in the first volume of the Federal Reporter. In the Federal Cases, some of these digest or syllabus paragraphs were taken from previous publications, and others were prepared in connection with the editing of the work, and the entire volumes were entered for copyright by the complainant.

It will thus be seen that any decision made by any court of the United States, since the establishment of those courts, respectively, can be found, together with some statement of fact and some digest or syllabus paragraph by a judge or editor, in the official series of the United States Reports, the Federal Reporter, and Federal Cases of the complainant. All cases decided by the courts whose opinions are covered by any series in question can be found in the publications of the complainant, from the date at which the particular series was commenced. But in addition to the printing of these reports containing decisions in full, with statements of the principal points decided by the cases, there has long existed, and contemporaneously grown up with the reports, various digests or collections of short statements of law and fact, with a reference to the case from which the statement is taken which is relied upon for the authority of judicial decision.

It will be seen that the worth of such statements, and the weight of authority thereby furnished, depend upon the accuracy and ability with which the statement is extracted from the opinion, as well as the standing and jurisdiction of the court making the decision. The purpose of such a digest is different from that of the argumentative and sequential narrative of a text-book, and furnishes (to the lawyer or judge consulting it) a catalogue of cases, with a speedy and convenient

method of locating the decisions bearing upon a particular point and of discriminating between them, in order to locate the particular ones affecting the point in question, or the holding of these cases thereon.

The field of the digest was particularly advanced, and the use of digests generally assured, by the work of Mr. Benjamin V. Abbott, who not only instituted the well-known series of New York Digests, and Annual United States Digests prior to 1869, but superintended and published, as long ago as the year 1872, a comprehensive United States Digest, which he called the "United States Digest, First Series." The preparation of the first volume of this work occupied the period between 1870 and 1872. Mr. Abbott was assisted in his work by Mr. John A. Mallory, who later continued upon the other United States Digests, which will be referred to subsequently, and upon the American Digest, with the West Publishing Company. Mr. Mallory completed, in its substantially final form, the division of the substantive heads of law into a system generally used, since about the year 1897, in the publications of the complainant and those licensed by it.

It is testified by Mr. Mallory that the beginning of this digest analysis or arrangement of subjects was undertaken in connection with Mr. Abbott, in the work upon the United States Digest, in the early 70's, and was continued until in later years the desirability of having a complete and uniform system of digesting, so far as the classification of paragraphs was concerned, became apparent from the digest system published by the complainant, and was completed and perfected for their use, even to the extent of being recommended and adopted by the American Bar Association, in the year 1897, in order to secure uniformity of treatment, and to avoid confusion in the classification of cases. The evidence does not show that any specific authority has been given to the public to make use of this digest classification, except by urging the advantage of its use, and as licenses have been granted to other publications. The system has been employed in connection with the complainant's books, and the evidence shows that the general scope of the classification has been a development from time to time, growing out of the work of Mr. Abbott, so that a particular examination will be necessary, in order to determine whether any disputed arrangement of topics and subjects is an infringement of original matter copyrighted by the complainant, or is merely a reuse of the ideas and work of the time of Abbott, or of copyrights sufficiently old so that their material has become public property.

The work of Mr. Abbott, and his copyrights on the United States Digest, First Series, and on the first nine volumes of the United States Digest, New Series, were assigned to the complainant in January, 1889. Volume 15 of the United States Digest, First Series, and volumes 10 to 18 of the United States Digest, New Series, were published and copyrighted by Little, Brown & Co., who employed Mr. George Fred Williams and other individuals to work upon the digesting of the reports and the preparation of the paragraphs to be inserted in the publication. The property rights of Little, Brown & Co. in these digests were conveyed to the West Publishing Company, the complainant, in the year 1889. About the year 1888 the West Publishing Company, en-

larging the scope of the digest, began what is known as the "American Digest," which has since been continued. A condensed edition, embracing what had gone before, and carrying on the work under the name "American Digest, Century Edition," commonly called the "Century Digest," was published in 1896. In addition, the complainant company printed a digest of the decisions in the Federal Cases, and, at different periods, digests of the cases in the Federal Reporter, and also printed a digest of the decisions of the Circuit Court of Appeals, for a time; but this material has been carried into the American and Century Digests, and into the Federal Reporter Digests. The decisions of the United States Supreme Court, and of the highest courts of the various states, have always been included in the scope of the American Digests, which, at the time of suit, covered the entire work of the Reporters as then printed by the complainant company.

The testimony shows also a series of books published by the Lawyers' Co-operative Publishing Company, of Rochester, N. Y., known as the "Lawyers' Reports, Annotated," in which are printed certain of the opinions, statements, and digests, substantially as contained in the complainant's reporters, and also the General Digest, begun in the year 1892, which contained material substantially identical in language, but different in appearance and type, from the digest paragraphs in complainant's American Digest for the corresponding period. The publication referred to frequently through the testimony as the "Cyclopedia," printed by the American Law Book Company, was first registered for the purposes of copyright in the year 1901, with volume 1, and has continued, not only to the time of instituting this action, but, as is shown by the testimony, was not in complete form at the latest reference thereto.

The following table will show, according to the testimony, but without attempting thereby to adjudicate the contentions of invalidity and abandonment, the chronological order of the complainant's and defendant's publications, with the number of the volumes, the date of registering, and thus the beginning of the periods for which copyright is claimed, and such other matters as can be set forth in a table of that nature.

### Complainant's Publications.

| Name of Publication. | No. of Vols. | Period Covered. |
|---|---|---|
| Atlantic Reporter | 53 | Oct. 1885, to Feb. 1903 |
| Northeastern " | 65 | July, 1885, " Feb. 1903 |
| Southeastern " | 43 | May, 1887, " Feb. 1903 |
| Southern " | 33 | May, 1887, " Feb. 1903 |
| Southwestern " | 71 | July, 1886, " Feb. 1903 |
| Pacific " | 70 | Feb. 1884, " Jan. 1903 |
| Northwestern " | 92 | 1879, " Jan. 1903 |
| Supreme Court " | 23 | 1882, " Dec. 1902 |
| Federal " | 118 | 1880, " Jan. 1903 |
| New York Supplement | 79 | June, 1888, " Feb. 1903 |
| Federal Cases | 30 | Feb. 1894, " Apr. 1897 |
| Federal Cases Digest | 1 | |
| American Digest | 20 | 1888, " 1902 |
| Federal Reporter Digest | 8 | 1885, " 1900 |
| Century Digest | 38 | 1897, " 1903 |
| U. S. Digest (1st Ser.) | 14 | 1874, " 1876 |
| U. S. Digest (New Ser.) | 18 | 1872, " 1888 |

Defendant's Publications.

| Name of Publication. | No. of Vols. | Period Covered. |
|---|---|---|
| A. & E. Enc. Law (1st Ed.)......................... | 29 | 1887 to 1896 |
| Enc. Pl. & Pr...................................... | 22 | 1895 " 1902 |
| A. & E. Enc. Law (2d Ed.)......................... | 23 | 1896 " 1903 |

An examination of the above list shows that at the time when any particular volume of any of the Encyclopedias was published, or in the course of preparation, a large number of volumes of the various digests, especially the two series of United States Digests, and some of the American Digests, were in existence. The testimony shows a long list of American and English digests and reports contained in the defendant's library at Northport, and, with the exception of a few scattered volumes, this library was substantially comprehensive of all American reports existent at any particular time. Later reports were added as fast as they were placed upon sale, and some missing volumes were supplied.

The various editorial writers were not only given the opportunity, but were instructed, to avail themselves of all of the books, including digests, reports, and text-books, in which any case bearing upon the subject upon which they were writing was reported or referred to.

It is evident that a book written and published in a certain year could not infringe upon nor be prepared from the contents of any book not yet in existence, and the comparative table above set forth will indicate the volumes of the various publications which were in existence when any particular volume of the defendant's publications was completed. Thus, for instance, the volumes of the A. & E. Enc. Law (1st Ed.) could none of them contain any of the new material of the complainant's works subsequent to the year 1896, when the first edition of the Encyclopedia was completed; but much of this material might be republished, and was republished, in different editions of the combined digests, such as the Century Edition of the American Digest, and in that form of publication would then be available to the writers of the defendant, and be at the disposal, so far as the work in the defendant's library was concerned, of any one who consulted either the earlier digests, or these later editions. Thus, the volumes of the Enc. Pl. & Pr. and the A. & E. Enc. Law (2d Ed.) not only included matter which had been originally worked up and published in the first edition of the Encyclopedia, but also material which had not been in existence, in published form, when the volumes of the first edition were prepared. At the same time, new and additional articles were prepared, from cases digested in the earlier as well as the later publications of the complainant.

With respect, therefore, to the later volumes of the Enc. Pl. & Pr. and the A. & E. Enc. Law (2d Ed.), the issue of alleged unfair use includes the question of the use of the more recent editions or publications of the complainant, even if the material therein published be the same as that contained in earlier editions. The work of the defendant's publications was progressive and contemporaneous. The works

of the complainant were also progressive—that is, chronological—and, whenever brought into a combined or comprehensive form, were also complete up to the time of publication; and we find from this fact that no uniform use of the publications was made by any two writers of the defendant, or even by the same writer at different periods, so far as the scope of his examination of authorities was concerned. An examination of the testimony, therefore, requires a constant reference to the table of publications, in order to keep in mind the books, in the form of digests and reports, which the writer could examine, and also to consider the effect of the use of the compiled digests, rather than the annual digests, or of the later publications instead of the earlier.

The United States Digests from 1847 to 1869 have cases and paragraphs which are continually recurring throughout the entire series of the complainant's works, and which are set forth frequently, with more or less verbatim accuracy, in the notes to the defendant's works. Many of the instances of alleged copying are explained, and an attempt is made by the defendant to justify them, on the ground that they are free to the use of every one, inasmuch as they were originally published in these digests, upon which the copyright has long expired. But such questions as this must be considered later, and the purpose of referring to them at the present time is merely to bring the different questions into view with reference to the first issue; that is, the charge of unfair use in the writing of the Encyclopedias themselves.

It may be taken as a premise that the right given to an author to multiply copies, and to prevent the appropriation of the copyrighted material by other persons, which is granted by section 4952 of the Revised Statutes (U. S. Comp. St. 1901, p. 3406), includes the right to recover damages where the damages can be proven, and to injunction where an injunction is the appropriate or necessary remedy, and such remedies are provided for by the statutes themselves, in sections 4967 and 4970 (U. S. Comp. St. 1901, p. 3416).

The earliest copyright law in the United States was passed in 1790, and it is unnecessary to trace the variations in the language of the statute upon this point, for the statutes have uniformly provided for the propositions just stated. The principles of copyright, and the awarding of damages and of equitable remedies, need no citation of cases.

A direct inference from the right itself is the liability incurred where literal copying is avoided, and mere paraphrasing or avoidance of the appearance of copying is obtained, while an appropriation of the subject-matter is had. In the case of Lawrence v. Dana, 4 Cliff. 1, Fed. Cas. No. 8,136, such paraphrasing was held within the provisions of the statue, and actionable the same as copying. Such paraphrasing, or such taking of material, can be proven in two ways, either by internal evidence, depending upon the sequence of ideas and language in such numbers as inevitably compels the conclusion that the copyrighted work was the source of the infringing publication, or direct testimony as to the manner in which the work was done. In the present case, both lines of proof have been followed, and the issue of copying, in the form of paraphrasing as well as literal abstraction of

consecutive words, has comprised a large part of the record in the case.

Actual copying, or such paraphrasing as to be equivalent to copying, was at first considered to be the only form of infringing use of copyrighted material. But the great diversity of printed publications, and the many phases of literary activity, especially when applied to minor pursuits, ultimately forced the construction of the copyright statute, in which the basis of injury is found in the unfair use of the material of the work in making up a book of similar nature, as well as in a direct copying or paraphrasing of the words therein contained. This extension of the law of copyright brings the case closely into the realm of unfair competition. But, while a likeness may be traced in the principles upon which this class of actions is founded, yet in application and in scope a sharp line of distinction can be drawn. Copyright is based upon statute, while unfair competition (except as it may be affected by legislative enactment, in connection with patents, trademarks, etc.) is dependent upon abstract principles of law. Copyright relates to the printed material of a publication, while unfair competition may be concerned with any article of trade, whether having words or letters in its composition and appearance or not.

In this connection it is well to cite some of the cases relating to copyright which affect the class of publications here being considered, in order to trace the advance in this idea beyond the original thought of copying alone, as a basis for granting relief.

The directory, map, and dictionary cases have already been referred to, and have themselves brought about a considerable advance in this particular line of decision, inasmuch as it is apparent, without detailed explanation, that infringement of copyright, by the verification and reformation of a list of names or words, with such corrections and amendments as may have developed during the period since the publication of the earlier work, depends more upon the idea of unfair use, and the unlawful saving of labor, in order to avoid the necessary original research, than upon the appropriation of any literary ideas or arrangement, based upon literary ability and studied plan.

Legal publications themselves, in some cases those even of the complainant and of the defendant herein, have been the source of adjudicated cases, and in this circuit the principles by which this case must be judged, from the doctrine of unfair use, have been laid down by the Circuit Court of Appeals, and are controlling when applicable to the present issue.

One of the earliest cases, and one of the most comprehensive with respect to legal publications, is that of Lawrence v. Dana, Fed. Cas. No. 8,136, 4 Cliff. 1, in which piracy was alleged, both on evidence of the manner of use, and also upon internal indications such as typographical errors, peculiar arrangement, and sequence of citations and language; the book as to which infringement was alleged being Lawrence's Annotated Edition of Wheaton's Elements of International Law, and the infringing publication Dana's Edition of that work.

There the court held that copyright may be justly claimed, where the author of a book has taken existing materials, from sources com-

mon to all writers, and arranged and combined them in a new form, if he has exercised skill and discretion in making the selections, arrangement, and combination, and has presented something new and useful—citing Gray v. Russell, Fed. Cas. No. 5,728; Lewis v. Fullarton, 2 Beav. 6; Greene v. Bishop, Fed. Cas. No. 5,763; Emerson v. Davies, Fed. Cas. No. 4,436; Story v. Holcombe, Fed. Cas. No. 13,-497.

The court then holds that the person who has obtained this copyright has a right to his plan of arrangement, but that he cannot prevent others from using the old material, and that, even in the same field of law, a new and different use of old material is not an infringement of the original copyright.

Further, following the same idea, it is held that an abridgment of a copyrighted edition of old material, if the material itself be open to use, is not an infringement, unless the arrangement is copied; that the doctrine is different from that of a patent, where the idea of the patent cannot be used, even if independently conceived—citing again Story v. Holcombe, supra.

The court ultimately determined that Dana's notes were not in the nature of an abridgment of Lawrence's Wheaton, but were new notes to the original text, and then went on to consider whether there had been unfair use of the original edition in making up the new notes.

The court there approves the rule of Judge Story, that to constitute an invasion of copyright it is not necessary that the whole of a work should be copied, nor even a large portion of it, in form or substance, but that if so much is taken that the value of the original is·sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement. The court later says:

"The privilege of fair use accorded to a subsequent writer must be such, and such only, as will not cause substantial injury to the proprietor of the first publication."

And the decision of the court was to the effect that many of the notes did infringe corresponding notes of the complainant's publication, that the respondent borrowed very largely the arrangement of the antecedent edition, and, without making a detailed specification of the instances of infringement, the question was referred to a master to report the extent of the infringement, and to classify the instances thereof.

The United States Supreme Court, in 1888, decided the case of Callaghan v. Myers, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547, in which it was held that a law reporter was entitled to obtain a copyright for the matter which was the result of his own intellectual labor, including the title page table of cases, any headnotes or syllabi, the statement of facts, argument of counsel, and index. But the court also said, as had been held in Wheaton v. Peters, 33 U. S. 590, 8 L. Ed. 1055, and Banks v. Manchester, 128 U. S. 244, 9 Sup. Ct. 36, 32 L. Ed. 425, that the rights obtained by copyright did not cover the opinions of the courts, nor the official statements of fact, and syllabi, if prepared by the court itself.

A number of cases are cited in the case of Callaghan v. Myers, at page 650 of 128 U. S., and page 185 of 9 Sup. Ct. (32 L. Ed. 547), following these propositions, and in that suit damages were granted in the final decree for infringements of the copyright of such volumes as had been satisfactorily proven to be copyrighted, and to have been infringed. Those books as to which these conditions were not proven were excluded from the effect of the decree; but where an infringing volume also contained lawful matter, and it was impossible to separate the profits derived from either class of material, the profits on the sale of the entire volume were awarded to the complainant.

The subject-matter of that action was a certain number of volumes of the Illinois State Reports, and the court considered both the issue of copying and of unfair use, in the sense that the defendants were alleged to have copied the complainant's arrangement or division of matter and its original material in the Reports, and to have referred to them and consulted them in the preparation of the books complained of.·

The defendant claimed that the opinions used had been compared with the originals, and corrections made; that the other matter in the volumes was obtained from the original records of the courts, and arranged, reported, compiled, and edited wholly by original labor; but the decision of the District Court (reported in 20 Fed. 441) was that in each of certain volumes the copyrighted work "had been used by the defendants in the headnotes, the statements of fact, and arguments of counsel."

In Simms v. Stanton (C. C.) 75 Fed. 6, the cases, including many of those already cited herein, and text-books upon the subject of copyright, are recited at length, and the language of Banks v. McDivitt, 13 Blatch. 163, Fed. Cas. No. 961, which is frequently referred to in the later cases upon the subject, is particularly referred to, and is there credited with having definitely limited the prohibition of unfair use, by saying that fair use prohibits "a use of any part of the previous book, animo furandi, 'with an intention to take for the purpose of saving himself labor.' "

Many different statements of this same idea are set forth in this case of Simms v. Stanton, and the question of recurrence to common sources for the material used is considered. Certain errors appearing in both works are found to be not important enough to establish the fact of copying or piracy; and the use which the defendant had made of the complainant's book, which was a text-book or scientific work on Physiognomy, was decided to be fair, when the purpose of the work was taken into account.

But some of the precise questions which must be considered in the present action, and which must be taken as the foundation from which different propositions must be considered, are to be found in the cases of West Pub. Co. v. Lawyers' Co-óperative Pub. Co. (C. C.) 64 Fed. 360, 25 L. R. A. 441, reversed in 79 Fed. 756, 25 C. C. A. 648, 35 L. R. A. 400, and the case of Edward Thompson Co. v. American Law Book Co. (C. C.) 121 Fed. 907, reversed in 122 Fed. 922, 59 C. C. A. 148, 62 L. R. A. 607.

It may be observed that the judge who wrote the opinion in the Circuit Court of Appeals in the latter case was the same who, as District Judge, decided the case of West Pub. Co. v. Lawyers' Co-operative Pub. Co. in the lower court, and who was reversed above, in that he had limited the scope of his decision to certain paragraphs found by the master, and had not applied the conclusions reached by him to the issues raised with respect to the entire publications involved. But it will be noted that the statement of the principles of law by Judge Coxe in the earlier case are cited with approval by the Circuit Court of Appeals, and the same principles, with a considerable review of cases, are the basis of the last decision of the four where, upon the application for a preliminary injunction, the court, without passing upon the question of infringement, held that a subsequent writer might be guided by earlier work, might consult the original authorities, and might use those which he considered applicable, in support of his own original text.

The subject-matter of the case of West Pub. Co. v. Lawyers' Co-operative Pub. Co., supra, was the series of digests and reporters owned by the complainant in the present action, in so far as they had been published at the time of bringing that suit. The alleged infringing works were copies of the General Digest, which subsequent to a date which will be referred to later have been substantially identical in form with the digests of the complainant, and the material for which has been furnished by the complainant to the Lawyers' Co-operative Publishing Company under a license or contract arrangement.

It may be assumed, as is admitted in the testimony, that this contract was entered into as a part of the outcome of the case above referred to, and the effect of this upon the complainant's copyrights will be considered when the subject of abandonment of copyright is taken up.

The suit of Edward Thompson Co. v. American Law Book Co., supra, was over alleged infringements or infringing use of the publications of the defendant involved in the present suit, so far as they had been completed at the time of that action, and the Cyc. which is frequently mentioned in the testimony, and which was then published by the company whose stock was, to a considerable extent, at some time acquired by different individuals holding positions and interested in the West Publishing Company, the complainant herein. In fact, in the case of Edward Thompson Co. v. American Law Book Co., supra, decided upon the 10th day of February, 1903, the court says:

"If the owners do not object to such use of their digests, their acquiescence may be taken to import a license. As to the digests which belong to the defendant [the West Publishing Company?], it would seem that the contention now advanced might more properly be made in a direct proceeding against complainant's publications, where the issue would be squarely presented."

The court there referred to a contention that the books of the Edward Thompson Company were themselves copied from copyrighted works of the West Publishing Company. The present action was begun by the filing of a complaint verified upon the 6th day of April, 1903. The suggestion of Judge Lacombe, therefore, was either quickly acted upon, or had already been in process of preparation. But, how-

ever that may be, the doctrine of these two cases is substantially contained in the following paragraphs:

"The following excerpts succinctly state the law governing cases such as this:

"A reporter [of opinions of a court] may acquire a valid copyright for the headnotes, footnotes, tables of cases, indexes, statements of facts, and abstracts of the arguments of counsel, where these are prepared by him and are the result of his labor and research. So he may have a copyright for a digest or synopsis of judicial decisions, and the selection and arrangement of cases relating to a particular branch of the law. The copyright protects only the original work of the reporter. * * * [He] has no monopoly of the opinions, decisions, and syllabi prepared by the courts and judges. * * * These opinions, decisions, and syllabi are free alike to all digesters. But when notes suitable for use in a digest have been prepared from these common sources of information, and properly secured by copyrights, a subsequent compiler in the same field is not permitted to avail himself of this original work, and save time and labor for himself by copying from the property of others. * * * He may take original opinions, and prepare from them his own notes, 'but he cannot exclusively and evasively use those already collected and embodied by the skill and industry and expenditures of another.'" 79 Fed. 761, 25 C. C. A. 652, 35 L. R. A. 400.

"Briefly stated, then, the question is this: Is a copyrighted lawbook infringed by a subsequent work on the same subject, where the only accusation against the second author is that he collected all available citations, including those found in the copyrighted work, and, after examining them in text-books and reports, used those which he considered applicable to support his own original text? We are of the opinion that this question must be answered in the negative. The doctrine contended for by the complainant extends the law of copyright beyond its present bounds, and if pushed to its logical conclusion will inflict a far greater injury upon literature than it can ever expect to prevent. If it be held that an author cannot consult the authorities collected by his predecessors, the law of copyright, enacted to promote the progress of science and useful arts, will retard that progress. It will be found upon examining the reported cases that there has been a finding of noninfringement, unless it appears that the whole or a part of the copyrighted work has been copied, either in hæc verba or by colorable variation." 122 Fed. 923, 59 C. C. A. 149, 62 L. R. A. 607.

This is the rule by which the testimony of the case must be considered and the issue on the subject of infringement determined.

The complainant has produced witnesses who have testified as to the methods employed by themselves while working for the defendant at Northport. It has obtained considerable testimony through the cross-examination of many writers who were called by the defendant to testify as to how they had prepared the portions of the books written by them. It has submitted exhibits containing parallel columns, showing text, notes, and lists of citations, where identity or similarity of language, sequence of ideas, and juxtaposition of words or citations are pointed out as tending to show copying or paraphrasing; that is, dictating from the material under observation in the copyrighted publications.

The complainant has inserted in these exhibits containing the parallel columns certain comments or footnotes calling attention to the points of similarity, and in most instances setting forth conclusions with respect thereto.

It may be said here that the defendant has introduced exhibits answering in series, and as to substantially each particular paragraph, these parallel column exhibits, and the defendant has inserted similar

comments or conclusions as a footnote to its own parallel columns or answering statements.

The introduction of these various series of exhibits was objected to by each party to the litigation at the appropriate time, and it seems that the objection should be disposed of in the same way as in the case of West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 Fed. 756, 25 C. C. A. 648, 35 L. R. A. 400. The conclusions and arguments cannot, of course, be taken as testimony; but the examination of a publication by an experienced person, where it is impossible to make the examination in court, can properly be accepted, if the facts found by the examination are the subject-matter of the testimony, and if the accuracy of those findings can be fairly tested by the proper opportunity for verification on the part of the other side. Conclusions and arguments in an equity record should be excluded as the court passes upon the testimony, and yet such conclusions in the reading of the record are substantially like statements in the briefs, and the entire exhibits can be properly used, and should not be uniformly and completely excluded.

The complainant has also introduced in evidence (and the defendant has supplemented that evidence by testimony of its own) certain digests or testimony as to digests in the library of the defendant, which have been cut to pieces, and the printed paragraphs therefrom pasted upon cards of uniform size, for the convenience of the editorial writers of the defendant. Many of these digests—in fact, substantially the entire series of digests alleged to be infringed in the complaint—have been used in this manner; and, where no copy of the digest was available for cutting and pasting such printed paragraphs, stenographers copied the various paragraphs from the annual digests, and the compiled volumes of digests, to take the place of the missing printed slips.

It has appeared affirmatively, and has not been contradicted, at least to any persuasive extent, that certain writers, such as Judge Peck, who wrote the articles "Contribution and Exoneration," "De Facto Corporations," and "Guardian and Ward," for the A. & E. Enc. Law (2d Ed.), never used printed or typewritten copies of digest paragraphs, but that he prepared cards of his own, containing the holdings of the cases, and the citations which he wished to use in writing his article, and, after making an arrangement of the material, dictated the article from these cards. And yet with reference to the articles written by him it is claimed that an unfair use of the paragraphs contained in the digests was the result of his work.

Other writers, like Mr. Charles C. Moore, appear from the testimony to have neither used digest paragraphs in the cut or copied form, nor to have used the digests at all in the writing of articles. But the complainant has produced many exhibits against articles written by Mr. Moore, to show that the language of his reading notes, and the list of citations, and even some paragraphs of text, bear the evidences of having been taken from the slips or headnotes of cases in the reporter system, and therefore unfair use is charged as to his work.

Some writers also testify that they made no use of digest paragraphs, and appear to have written their articles from an examination of the cases. But in their work, similarly, resemblances are pointed out,

from which it is urged that they have saved themselves labor, have made use of the syllabus paragraphs, or have unconsciously appropriated the case digester's deductions, from the fact that the syllabus was read in connection with the opinion in the case.

Other writers testify that they collected all of the paragraphs, citations, and material which was available, either in the publications of the complainant or in other works, including text-books, reports, and digests in the defendant's library; that these paragraphs were assorted, in some instances by a reference to the black-letter line or headnote suggestion of the digest, in some instances by the general natural classification of the subject, and in some instances by a previous partial analysis of the article by the writer, and that under each head was grouped the material from these various books, as well as from the various annual volumes of the same publication; that then the cases were looked up and the original reports consulted. In practically every instance the writer used the syllabus in the sense of examining it, and having it in mind in reading the report of the case. In many instances the syllabus was consulted, and sometimes followed, either exactly or in a paraphrased form, in dictating paragraphs which were later, and after further classification, used for the writing of the text.

Still other writers testified that they used the digest paragraphs and syllabus notes for reference; but, having looked up the case and found that no language was to be taken therefrom, the words of the paragraphs or of the printed slip were stricken out, and the bare citation or title copied from the slip, in connection with others of like character, in the order in which the slips might be arranged by the writer.

It should be borne in mind throughout this entire discussion that the text of the defendant's books is much shorter; that is, contains many less words (although printed in larger type, and so placed upon the page as to be easily followed) than the footnotes or lists of cases which are appended to its text, and which cover the field from which the text is derived. One proposition in the large type of the text may have a quantity of footnotes, in the form of statements of varying applications of text propositions, throughout the federal and state courts, as well as those of England and Canada, and in such connection one statement of text will carry the citation of many cases which are merely cumulative or illustrative of the authority for the text. In such an instance, a stenographer could add citations after the cases had been examined by the writer, by a mere reference to the cards, whether printed, typewritten, or filled in by hand, and the order of the citations would be the arrangement by the writer, unless the particular printed or typewritten paragraph contained a number of citations upon the one sheet, in which case the order of the citations would be copied, as well as the material of the citations themselves.

The complainant has also brought in the testimony of certain witnesses, who testified that in case of haste, or where they became satisfied that the digest paragraphs were correct, through the reference in some opinion, or because the proposition was so well known that it did not need investigation, they actually copied or cited the digest material to a greater or less extent.

And, finally, in rebuttal, the complainant introduced certain evidence, which was received under objection, and which consisted, not only of testimony, but of the slips used by Messrs. William A. Martin and W. R. Hale in writing two large articles in the A. & E. Enc. Law (2d Ed.); the article prepared by Mr. Martin being that of "Intoxicating Liquors," and the article by Mr. Hale being that of "Patents." Mr. Martin produced certain slips, for which the testimony shows he was to be paid $400 if they were introduced in evidence, which slips, comprising some 12 or 13 boxes of bundles, were identified by him as the identical slips from which he wrote the article "Intoxicating Liquors," without consultation, to any appreciable extent, of the cases cited upon the slips, and in the writing of which article he used both the digest and syllabus paragraphs to such an extent as he deemed them applicable.

In the case of the article on "Patents," Mr. Hale has testified that under instructions from the editor in chief he wrote hurriedly from certain slips furnished by one Mr. Perry; that Mr. Perry had begun the article, but that Mr. Hale found it impossible to use his material, and rewrote and eventually furnished the greater part of the article as printed, some of the latest chapters having been prepared by others, in order to complete the work by the time it was needed.

Mr. Hale has testified that he used the cut and pasted digest slips, which are represented by the exhibits called the "Perry Patent Slips," both to the extent of following the analysis of the digest system, and in the use of pasted cards in arranging his material according to that analysis, and in dictating the article after the reliability or accuracy of the slips, and the statements therein contained, had been verified by him through a consultation of text-books and cases.

To a certain extent Mr. Hale, also, for the sake of haste, relied upon a portion of these digest paragraphs without verification, and in general Mr. Hale testifies that, not only did he make use of material derived from the complainant's digests and reporters, in the article on "Patents," but that he had, to a certain extent, but with more complete verification from original sources of the citations and statements, used such a method of writing during his entire service at the defendant's editorial rooms, covering a period of some seven years, in which time he wrote some 2,100 pages, or nearly one-eighth, of the Enc. Pl. & Pr., and some 849 pages of the A. & E. Enc. Law (2d Ed.).

The defendant has questioned the accuracy of Mr. Hale's testimony, from the standpoint of his bias, in that he became the solicitor for the complainant after severing his relations with the defendant, and at the close of the complainant's direct testimony.

The record would indicate that the defendant considered Mr. Hale to have been in consultation with it. It appears that he made an affidavit for the defendant with relation to his own work, in answer to the application for a preliminary injunction in this case, and that upon that occasion he prepared the affidavit himself, and denied inferentially any unfair use by him of the complainant's publications. Mr. Hale frankly, if somewhat to his own embarrassment, testified that his ideas upon the subject of unfair use of copyrighted material had

been changed, and that he had prepared his articles with the aid, to a greater or less extent, of the digest paragraphs, and of the headnotes or syllabi of cases. It appeared from his cross-examination that the result of his training when previously working for the complainant, and when writing for the defendant's Encyclopedias, has resulted in his following a method of work, which at the time he considered legitimate, but which, when viewed from the standards and legal propositions now contended for by him as counsel for complainant, would lead to the conclusion that the results of that work would be infringement of the complainant's copyrights, if the title to the copyrights themselves should be successfully maintained.

The testimony developed the fact that Mr. Hale, while engaged as a law writer for the defendant, and while discussing the issues of the present action, at about the time of the application for an injunction pendente lite, advised the defendant's solicitors to interpose a plea, rather than an answer, and this suggestion was based upon so-called "Syllogisms," which were reduced to writing, and which appear in the record. These syllogisms are as follows:

### What Constitutes Infringement of Copyright.

1. Infringement consists of the violation of the exclusive right conferred by the statute.

2. The exclusive right conferred by the statute is "the sole liberty of printing, reprinting, publishing   *   *   *   and vending". the copyrighted matter; i. e., the exclusive right of multiplying copies.

3. Hence, there can be no infringement of copyright unless there has been copying, either in whole or in part of the copyrighted work.

1. Copying consists in the exact or substantial reproduction of an original, using such original as a model, as distinguished from an independent production of the same thing.

2. Two copies of a common original are not copies of each other, though identical.

3. Hence, a book written from the original sources—i. e., cases—is not a copy of another book written from the same sources, even though such book is used to point the way to such original sources, such use being the only use made of such other book.

### Common Use.

1. The public are entitled to make any use of a copyrighted book which does not amount to a violation of the exclusive right given by the statute.

2. Anything less than a substantial copy of the whole or a material part of the book does not violate the exclusive right given by statute (99 U. S. 675), (and first syllogism supra).

3. Hence, any one may copy less than a material part of a copyrighted book; i. e., he may make a fair use of it.

### Conclusions.

The law upon the subject of infringement of copyright is as follows:

1. There must be some copying in order to constitute infringement. If there is no copying there is no infringement, and the question of fair or unfair use does not arise.

2. Even where there is some copying, that fact is not conclusive of infringement. Some copying is permitted. In addition to copying, it must be shown that this has been done to an unfair extent. It is only after copying has been shown that the question of fair or unfair use arises, and then it is controlling. Several classes of cases of copying have been held to be fair and hence not an infringement, such as "fair quotation," "extracts for comment and criticism," "bona fide abridgments," etc. Perhaps others will be recog-

nized when they arise. Each case depends upon its particular circumstances.

3. The use of a copyrighted book merely as a means of reference to the original cases does not constitute copying, and hence is not an infringement, and hence does not present any question of fair or unfair use. All uses of a book are dedicated to the public by publication, except such as are reserved by the statutes.

4. Of course, a copy of an original is none the less a copy because its references have been verified by subsequent resort to the original sources. But the use of the original as a means of reference to the original sources, from which the book is subsequently written, is more than mere verification, and is not copying.

5. So there may be copying without any verbal identity. This would occur if a proposition were reproduced from a copyrighted book without independently producing it from the original source.

April 30, 1903.                                                                 W. B. Hale.

### Paraphrasing is Copying.

#### Infringement of Copyright in Legal Works.

1. If I reproduce the propositions of law from a previous work, using the same or different language, without independently producing the proposition, I have copied it, and therefore have infringed.

2. If I append to the propositions of law so copied the lists of cases cited in the original work in support of said propositions, without examining the cases in the reports, I have copied them and have infringed.

3. If I reproduce the propositions and cases as above, but also examine the cases in the reports, I have made a verified copy; but it is still a copy, and hence an infringement.

4. If I publish a list of cases cited in the previous work, but without reproducing the propositions to which they are cited, I have not infringed, although I have copied every case cited in the book, because there can be no copyright in the mere names of cases apart from the propositions of law which the cases support. It is not a "copy" because it does not convey the same information.

5. If I take a list of cases from a previous work, then examine the original reports, and deduce for myself from the reports the propositions which the cases support, and cite the cases in support of such propositions, I have copied nothing and have not infringed. The information conveyed is not derived from the previous work, but from the reports. The correlation of the cases with the propositions is not taken from the original work, but is independently produced. As the names of cases appear in the subsequent work, they are not copied from the original work, but are copied from the reports, which are the common and original source.

6. In all cases of compilation, a distinction must be drawn between verifying a copy and making an original compilation. The first constitutes an infringement; the latter does not, though the resulting product is exactly the same. The fact that it requires as much labor and expense to make a verified copy as to make an original compilation is wholly immaterial.

It may be observed that substantially each of the propositions set forth by Mr. Hale in this document is a correct deduction of the law, but that the application of the propositions is open to argument; and the determination of the questions of fact raised by the propositions, in most instances, will substantially determine the questions at issue in this portion of the case. For instance, Mr. Hale states that there can be no infringement of copyright, unless there has been copying. The question to be determined is: What will be held to be "copying," rather than any dispute as to the effect of such copying, if the question has been answered and copying has been found?

The discussion of the cases which has previously been made in this opinion shows that with respect to the use of copyrighted legal pub-

lications the courts have included, within the term "copying," not only paraphrasing, but also the appropriation of the literary work, labor, and ideas of another, and that this includes arrangement and selection, as well as mere language.

Mr. Hale's proposition that two copies of a common original are not copies of each other, although identical, must be tested as applied to the issue of fact, as to whether the identical use of the original material was made from a recourse to the original document, or whether it was by means of an unfair appropriation of the copyrighted paragraph, after verification of its genuineness, and in order to save the additional labor of making up a new original.

The parallel column exhibits show hundreds of digest paragraphs and headnotes, which were apparently taken from the cut and pasted cards, or from the headnotes of the Reporter System, after verification of the identity and accuracy of language in these paragraphs with language of the official opinions, or of the official headnotes in the reports not published by the complainant.

The complainant has introduced exhibits comprising the greater part of the books published by the defendant, in each of which certain articles, sometimes examined completely, and sometimes at stated intervals, have been marked to show language bearing such close resemblance to language found in the publications of the complainant as to indicate the use of the complainant's books, unless these words can be traced to a different source, or unless it is affirmatively shown that the writer derived them from the official publications or digests of which no copyright belongs to the complainant.

In a similar way, the defendant has introduced a series of the same books, marked with a cross-reference of the complainant's underscored exhibits, to the old digests upon which the copyright has expired, to the official reports, and the headnotes of these reports, and to different publications put upon the market by licensees and by the complainant, by reason of which use the defendant contends that the copyright has been abandoned.

An examination of the parallel column exhibits, of the underscored book exhibits of the complainant, of the answering parallel column exhibits of the defendant, and of underscored book exhibits of the defendant, leads the court to the conclusion that the defendant's writers, to a considerable extent, throughout the various volumes of the A. & E. Enc. Law (2d Ed.) and the Enc. Pl. & Pr., availed themselves of the cut and pasted paragraphs of the digest statements, and that the headnotes of the Reporter System, in so far as these sources were referred to by the writers, were under the observation and comparison of the writers when dictating propositions of text, and in many instances were used as notes or statements of legal conclusions, attributed to their proper citation, without any intentional copying or appropriation of the material of the complainant's books so far as the writer was aware at the time his article was prepared.

The court is satisfied that the defendant's writers, having established and formulated a text proposition, frequently arranged, as a footnote to that text, the paragraphs whose accuracy had been verified, or

whose conclusions had been substantiated by a consultation of textbooks and reports, and appended the cases contained in the digests, after a similar verification, making use of the assortment of digest and syllabus citations without rewriting or recopying the same.

It is considered by the court that in so far as the use of such material, without original digesting or renotation of citations, was equivalent to a saving of labor and of expense of copying, and to the gaining of time, the defendant's writers brought themselves within the doctrine of what has been held by the cases to be unfair use, even though such material, and the several citations and paragraphs made use of, could have been properly and without criticism obtained by entirely original work, at the expense of the greater amount of effort.

As to the A. & E. Enc. Law (1st Ed.) a somewhat different situation exists. The instances of copying, or of mere paraphrasing, and the use of material claimed by the complainant, were much more extensive in that work. The question of determining whether or not unfair use was made by the writers of the first edition would be much easier than with respect to the Enc. Pl. & Pr., and the A. & E. Enc. Law (2d Ed.). But the A. & E. Enc. Law (1st Ed.) is shown by the testimony to have substantially been withdrawn from sale before the present action was started. At this date, the A. & E. Enc. Law (1st Ed.) is not a salable book, having been entirely superseded by the later works. In so far as the A. & E. Enc. Law (1st Ed.) might be held to have infringed, without considering the affirmative defenses or the explanation of the material in that work, which is claimed to be available to any one because of its publication in uncopyrighted works, or in those on which copyright has expired, it seems to the court that in the present action no equitable relief can be granted, for no injunction would be of any avail. Nor could any accounting for damages be had as incident to equitable relief, for the reason that at the time of the bringing of this action complainant had a full and adequate remedy at law with respect to any injury which it might have successfully claimed because of the manner in which the work was conducted. But, in addition, the A. & E. Enc. Law (1st Ed.), in so far as its writers made use of the publications then available, is largely justified, and the amount of the apparent infringing work reduced to a small quantity, from the fact that it was completed early in the year 1895, before the publication of the Century Edition of the complainant's digest, and that the greater part of the material in the A. & E. Enc. Law (1st Ed.) was then open to the world, the copyrights having expired, or was made up of material contained in official publications substantially similar to the complainant's paragraphs and statements of law.

The defenses relating to the abandonment of copyright, laches, and acquiescence will be considered in their proper turn, bearing in mind the date of the publication of the A. & E. Enc. Law (1st Ed.) with respect to all the publications; but they add to and strengthen the determination of the court so far as this earliest publication is concerned.

The testimony shows that the Enc. Pl. & Pr. and the A. & E. Enc. Law (2d Ed.) were not, in a proper sense of the term, revisions or

later editions of the A. & E. Enc. Law (1st Ed.). For commercial purposes these works were held out to the public as being newer and more complete forms of the earlier publication. But an examination of the books, as well as a consideration of the testimony, leads to the conclusion that even the material in the first edition was not relied upon nor used by the subsequent writers to such an extent that any unfair use of the complainant's publications could be predicated upon the fact that the A. & E. Enc. Law (1st Ed.) was studied and consulted by these later writers in preparing the ground for their own work. In almost every instance the subject was entirely rewritten, and, if either the Enc. Pl. & Pr. or the A. & E. Enc. Law (2d Ed.) are to be held infringing, it must be upon the work actually done by the writers of these articles, and not because of the assistance obtained from the earlier work.

This discussion brings up a point with relation to the question of unfair use which is applicable to all three of the defendant's publications, and which can be most conveniently considered in this connection.

The dictionary, directory, and map cases, so called, which have been heretofore cited, suggest that if the subsequent writer has used the original publication, in the sense of material which he appropriates after verification and correction, the new book would be but a later edition of the old, and its publication could be enjoined. But if the subsequent writer had taken the earlier work merely as a convenient and cheap method of transcribing his original material, or had used the printed lists of words or names to make clear and legible copy, and it could be affirmatively shown that the entire work had been original on the part of the subsequent writer, with the exception of the saving in handwriting or stenographic preparation of that material, it is considered that the remedy would not be by way of injunction, but that the person owning the copyright might be entitled to damages for the mere mechanical saving, if it could be brought within the term "unfair use," but that it would not be literary piracy. Such damages would be further mitigated by the rights of ownership which are granted by the sale of the physical object represented by a printed book; and it is considered that it would be extremely difficult, if not impossible, to separate the title which the purchaser has in the printed book from the right which the owner of the copyright has reserved under the statute, to the extent of reserving to himself remedies for wrongful appropriation of his published copyrighted material, if that appropriation did not at the same time carry with it a use of his literary ideas and literary material. In the same way the Encyclopedia writers, as has been held in the various cases, have the right to consult the digests, and to obtain therefrom clues to the contents or the holdings of the various cases, as a means of locating the cases relating to any particular subject. They have the right, subject to verification, to collect the cases cited by the digests, and to classify them under the same head, if the literary work or arrangement is not thereby appropriated.

It does not seem to the court that the owner of a copyright is en-

169 F.—55

titled to equitable relief against another publication solely because the writer of that other publication may have saved a certain amount of stenographic labor, or of manual handwriting, by cutting or copying the words of the citations from the digests, where no literary ability is appropriated in the arrangement or collection of the cases themselves. So an Encyclopedia writer, who has formulated a proposition of text and directs his stenographer to add to that text the citations shown by all of the digests, would not be guilty of infringement, and would not thereby make himself liable to a decree in equity, if, after proper research and verification, he merely for convenience used the printed words in making up the article, instead of having the stenographer rewrite the same at his dictation, with the original books in his hands when dictating, instead of having been examined and laid aside when the citation was found to be correct.

An extension of the same idea applies to the dictation or quotation of digest paragraphs and syllabus headnotes, after an examination of the original cases, and verification of these paragraphs or headnotes in the official publications, or in works as to which rights of copyright may have been lost.

The necessary advance in any science, and the very purpose for which text-books and legal publications are prepared, contemplates, to a certain extent, the dissemination of knowledge and improvement in the literature of the science, which is open to a subsequent writer as much as to a lawyer or judge, who is earning his living partly by the use of the copyrighted books. The words "unfair use," while having a broader meaning with respect to the appropriation of earlier writings by a work covering substantially the same ground, and supplanting the earlier book, than they have in the acquirement of knowledge upon the part of a student of the field treated by the publication, cannot, nevertheless, be arbitrarily made to be equivalent to no use at all, outside of consultation, in verifying the ground covered and the subjects or cases comprised in the earlier work. Such construction would mean that a later work would be no advance upon the earlier work, unless the writer had superior training or greater ability in doing the same thing which the earlier writer had attempted, and the improvement and advancement in the science itself would thus be sacrificed, and the writers of books would be deprived of the proper growth in knowledge, and from taking advantage of the position to which the earlier writers had carried the science under consideration.

But, applying the doctrine of the Circuit Court of Appeals set forth in the case of West Pub. Co. v. Lawyers' Co-operative Pub. Co., supra, which held that, if some substantial use of the copyrighted material was shown, injunction against the entire publication would be proper, unless the defendant could affirmatively justify its work, as to particular portions of the books complained against, and thus excepting from the decree only such articles or volumes as were affirmatively cleared of the accusation of infringement, it must be held, in the consideration of this portion of the case, that such articles as "Patents," "Intoxicating Liquors," and others of like composition and construction in the Enc. Pl. & Pr. and the A. & E. Enc. Law (2d Ed.), were prepared in such a way that unfair use would seem to be shown if they are not

justified, or if the affirmative defenses do not relieve them from the effect of this determination. It must also be held that the entire A. & E. Enc. Law (1st Ed.) has been shown to infringe, unless in the same way the affirmative defenses, or the explanation of the source of the material therein, be sufficient to indicate that merely an immaterial portion of the work was derived from sources free to the public in earlier publications, or released by the abandonment of copyright, or affected by the pleas of laches and acquiescence.

The testimony of Mr. William Lawrence Clark and of Mr. Charles Porterfield, and the conclusions as to the manner of their preparation of the articles written by them, are typical of nearly all the writers whose testimony has been introduced in evidence, with the exception of Mr. Hale and Mr. Martin.

It is apparent that Mr. Clark saved himself labor, and saved the defendant expense, by the use of printed slips, after a more or less careful verification of the accuracy of the slips so used. The testimony of Mr. Porterfield shows that he appended lists of cases to his statements of text, after a similar verification and comparison, and that he saved physical work and stenographic or manual labor to the defendant by the use of citations from the complainant's publications. But it is considered that the work of such writers, as exemplified by the two mentioned, did not cause in the Enc. Pl. & Pr. and the A. & E. Enc. Law (2d Ed.) any such substantial or material appropriation of the literary work of the complainant as would justify the granting of an injunction against the work, but, as has been said before, might have been ground for a claim of legal damages, if the other explanations and defenses be held insufficient.

The defendant furnished to its writers, almost uniformly, a series of instructions, by which the writers were warned against any appropriation of the literary labors of those who had protected their works by copyright, and the editors of the defendant's works, in their instructions to the writers orally, as well as by these rules, drew the attention of the writers to the necessity of original work, and definitely warned them against unfair use. Further, the defendant had the prepared articles examined to such extent as was deemed necessary, depending upon the experience of the writer and the circumstances of his employment, with a view to avoiding copying and the appropriation of copyrighted work.

The defendant was responsible for the results as published, and it cannot avoid that responsibility by a claim that it did not intend to do wrong. But the efforts which it made in avoiding any such wrong are to be considered in determining whether equitable relief should be granted because of the unwitting profit and use which was gained from the insertion of material which violated the rights of others, in spite of the efforts to prevent such a result.

The complainant has shown that wherever work was credited by the defendant's writers to the digests of the complainant and the reports of the complainant's Reporter System, such references were stricken out by the editors and revisers, and citations to the official series of reports inserted, and the defendant has thus undoubtedly laid itself

open to the charge of using many quotations and citations which, if accredited to the complainant's works, might have been free from criticism. The defendant explains this, and attempts to justify its action, by stating that it thus attempted to avoid the actual use of copyrighted material. Such methods have resulted in laying the paragraphs open to criticism, and in compelling explanations as to the right to use the paragraphs thus questioned, and has increased, to a very appreciable extent, the proportion of its various publications which are thus brought within the rule that the defendant must justify its use, rather than that the complainant must affirmatively show that the defendant did not have the right to so use the matter referred to.

Such articles as those of Mr. Porterfield and Mr. Clark show in isolated paragraphs, and in sequence of words and cases, that they were written with some aid from the digests and reporters, and that a saving of labor and time resulted. The same conclusion as to use (but of various degrees and in varying proportion) must also be reached with respect to some work of a majority of the writers, and, indeed, a majority of the articles in the Encyclopedias, of the defendant.

The entire first edition and volume 1 of the second edition are permeated with paragraphs which indicate some use of language of complainant's digests and reporter syllabi, and such use compels us to examine further, in order to see if the gain in labor and time was by means of the appropriation of literary or copyrightable labor or property. We must in so doing consider the excuses or justification presented as to each paragraph and as to the general results, and must also consider the affirmative defenses. The question of remedy in this action being comprehensive rather than specific, and the determination as to unfair use depending upon the amount of benefit and saving which was obtained by paraphrasing or adapting material original and copyrightable in the book from which the material was used, this court is compelled to make general findings from the testimony shown, rather than to go through the evidence like a special master and merely catalogue the paragraphs coming within the rules laid down by the cases cited.

The charge of copying has, in some cases, been based upon the identity of a few errors, which would certainly have been detected if original work had been done; and in the absence of evidence to the contrary, and with testimony from which a similar course of writing could be presumed for an entire book, the court has found that the entire practice and method of writing was improper, and the entire book, therefore, liable to an injunction. Trow Directory, etc., v. U. S. Directory, supra. In somewhat the same way, after an examination of the testimony as to the entire work, two volumes of the General Digest, with the exception of articles by two authors, were held to have infringed, and an injunction was granted in the case of West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 Fed. 756, 25 C. C. A. 648, 35 L. R. A. 400. But the issue in the present case is much different, while involving the same questions as a part of the complainant's case. As

has been said, if no question was being considered other than whether the defendant's writers had made use of the complainant's works, to such an extent as to have appropriated some of the language and ideas, and thus to have saved original labor on their own part, the case would be exactly similar to the one involving the General Digest above mentioned. But in the present suit a much more detailed analysis has been made of the paragraphs, from which the court is asked to decide the issue of copying. Much of the material contained in the paragraphs under examination is shown to be material, available to the defendant's writers, and even in paraphrased paragraphs the language so used is substantially that of the official opinion, or of other publications. This takes away from the complainant's paragraphs the greater portion of the copyrighted statements, and leaves the scope of the complainant's copyright limited to the arrangement of a few words, and to slight modifications of the points as expressed in the original source. The very necessity of following the direction of the Circuit Court of Appeals, in the General Digest Case, supra, and applying to the entire works the conclusions of the paragraphs shown in the testimony, in deciding whether unfair use has been had, and whether injunction will lie, brings us to the conclusion that the extent of the use, in so far as it took advantage of the material in the complainant's paragraphs, of which they are the owners by reason of the copyright, is comparatively small, and that most of the individual paragraphs examined, and inferentially, therefore, the most of the paragraphs in the entire Encyclopedia which were written after any use of the complainant's books had been made, have been shown to be statements of ideas and propositions which the defendant could fairly use, and as to which, even if some advantage was gained by the methods employed in connection with the complainant's works, nevertheless that advantage was not such as would justify this court in granting an injunction against the entire series of publications.

One class of material in the complainant's publications, as to which the question of unfair use must also be treated from a general standpoint, relates to the analyses of the various subjects according to which the substantive propositions of law can be divided, and the various titles of articles classified.

The complainant's digests and the Reporter System, both in the monthly pamphlets and the annual volumes, make use of what is commonly known as headlines or black letter catchlines, and any particular branch of law is treated, not only according to a certain index, made up of these headlines, but each subdivision is further classified by more detailed headlines, and particular paragraphs have what is known as a catchline to furnish a key to the main proposition for which the case is cited.

The testimony shows that as far back as 1871 Mr. Benj. V. Abbott began to put into effect the experience gained by him in digest work, and his analyses, as has been previously stated, were followed out through the different years, and a complete and substantially satisfactory system of classification for digest purposes was perfected and recommended to the use of reporters, text-book writers, and all per-

sons who might have need to employ anything in the nature of an analysis of legal subjects. There seems to have been no attempt to copyright this by itself, although, in so far as it was used in the complainant's publications, it was covered by the copyright of each volume; and assuming, in any volume copyrighted by the complainant, some portion of the digest analyses, titles, and headlines has been copyrighted, including the classification or arrangement of cases under these analyses and headlines, the question of unfair use arises with respect to the defendant's publications, wherever such analysis or arrangement was made use of by the defendant's writers.

Many of the writers have testified that they made up a tentative or experimental analysis or division of their subjects before commencing to read, and that they arranged or shuffled their digest paragraphs, with such notes as they might have prepared at the time of arrangement, according to this tentative classification. In many instances such classification was substantially that of the digest analysis, and was in general much like, any new or original arrangement of the same subject. But each writer, from his reading of text-books, of the digests, or of the earlier edition of the Encyclopedia, and of the publications relating to his subject, must have followed, consciously or unconsciously, an arrangement which, if protected by copyright, and entirely the property of the complainant, even if the writer consciously avoided appropriation and endeavored to prepare out of his own mind, would nevertheless result in his benefiting by the aid of the complainant's publications and their uniform classification of the propositions for which the cases were cited in their volumes.

The questions of validity of copyright upon such a system of analyses, and upon a series of catchlines, and whether such a copyright would be limited to the particular arrangement in any one work, or would cover the entire general scheme, will be considered separately. But while on this subject of unfair use, it must be held that the defendant's writers have been shown by the testimony to have used, and in some cases to have followed, to a considerable extent, the analyses and headlines of the complainant's works, and to· have made up the index of the various chapters of the Encyclopedias, either through the aid of, or by a mere ratification of, large portions of the subdivisions themselves. But can it be said that such use is an unfair use, or that, in a subject like the law, the division of titles into subheads, and what may be called "index classifications," can be made the subject of copyright, so that no subsequent writer can treat any particular subject, unless he entirely avoids making any analysis, or makes one entirely different from what has been recognized to cover the scope of the subject in the treatment of previous writers. The catchlines or mere large-type phrases, used to attract attention to particular cases, might of themselves contain literary material which should not be copied and used by another, and the assortment and division of cases, in preparing and inserting such headlines, in so far as it constitutes an arrangement, might be properly something as to which a man could object to its appropriation by another. But assuming, as has always been considered, that any person has the right to obtain from a digest,

or text-book, or other publication, a list of cases, with the appropriate clues to what those cases held, it would seem to be impossible to find unfair use, in making up by actual arrangement and classification a series of citations and notes which, when completed, resembled the arrangement in the complainant's digests, and in the making of which some assistance had been obtained from the fact that those digests had been used.

The testimony does not show a single instance, even in the index to the article "Patents," which Mr. Hale testifies he copied from the digest arrangement, of mere appropriation of material belonging to another person. But, on the contrary, the writers, having made a legitimate use of the help funished by the digests in every instance, formulated an index, and whatever unconscious or intentional copying or adaptation occurred, so far as these indices and analyses are concerned, was, in the opinion of this court, within the limits of a fair use of the digest material. The question varies from the proposition considered in the case of Edward Thompson Co. v. American Law Book Co., supra, where one Encyclopedia was found in the lower court to have taken the analyses and articles of the other Encyclopedia as equivalent to instructions and guides to its own writers as to what work they should do. Such acts would be akin to the dictionary and directory cases which have been so often referred to, and differ entirely from the case at bar.

The next question which must be considered is the affirmative defense of invalidity and abandonment of copyright, and in connection therewith must be considered, not only the method by which the complainant attempted to obtain the 9,000 copyrights which it is alleged in the complaint have been infringed, but as well the effect, upon such of the copyrights as were properly perfected and obtained, of the methods of publication, not only in the books of the complainant itself, but of various parties who have used greater or lesser portions of the copyrighted material under license.

The first and broadest question is that of title to the copyrights filed by the complainant itself. The complainant has charged the defendant with infringement, not of any one particular copyright, nor of any number of copyrights, by any specific designation or allegation relating to that copyright alone. This suit has not been based upon any one book or article as to which copyright was claimed, and even with respect to the entire 9,000 copyrights the allegations of infringement do not charge that any particular portion of the defendant's works infringed any particular portion of the copyrighted articles, but assert that the defendant has infringed, in printing, publishing, and selling the 74 volumes of the defendant's publications, against the rights of the complainant, through its ownership of the copyrights which it has filed, and which it has acquired by purchase. Such a general charge, rather than collection of specific and individual charges, necessarily has some effect upon the scope of the issues of the case, and also upon the questions of relevancy, materiality, and competency of proof.

The defendant has alleged multifariousness in the complaint; but proper equitable jurisdiction on various grounds having been shown,

and the defenses being applicable to the allegations as set forth, the extent to which the entire issue has been tried, argued, and presented to the court makes it impossible to give any weight to this technical defense, which could have been raised by demurrer. The condition of the record has compelled a determination upon the merits. In the same way, the many phases of each particular question, and the general charges which must be weighed in comparison with answers equally general in form, and the general deductions from the complainant's proofs which must be considered, in connection with similarly general conclusions from particular statements in the defendant's proofs, all go to show that no portion of the case can be decided upon any particular copyright, nor upon single instances of inaccuracy or carelessness in the methods of taking out copyrights at the time of publication.

An entire book of hundreds of pages may have been registered under one copyright title. The defendant may have used certain material from that particular book in each one of its 74 volumes, and yet this case cannot turn upon the single issue as to whether that particular copyright was valid or invalid.

The complainant has shown a reasonable degree of care in its efforts to comply with the copyright law, and in filing its two volumes of each publication, with the title pages of volumes which it was on the point of issuing, throughout the entire period as to which this case is concerned, with the exception of some volumes soon after the change of statute in 1891, by which the book had to be filed "not later" than publication, rather than within 10 days after publication as had been required by Act July 8, 1870, c. 230, § 90, 16 Stat. 213. Some books were thus not properly copyrighted, some few books were never copyrighted by any one, and a few scattered publications were improperly registered, for various reasons which will be specifically named later.

The testimony of the officers and clerks of the complainant, and the exhibits in the form of receipts and memoranda, with reference to the mailing of two copies of the publication to the Librarian of Congress at Washington, D. C., were put in under objection. It does not seem necessary to consider each specific objection separately, for the reason that the testimony as a whole, and in so far as it was competent, plainly showed a custom and course of business from which the presumption necessarily arose that, except in occasional and unintentional instances, the requirements of the statute were properly observed, and the necessary acts performed by the complainant to secure the copyrights intended. In the same way, testimony from the office of the Librarian of Congress, and the record of deposits of title, make satisfactory proof that the complainant's books were, on the whole, properly entered for copyright, and the statutory requirements observed, except in the instances hereinbefore referred to, and in the particular cases which can be included in a list of the copyright titles successfully attacked by affirmative evidence on the part of the defendant.

But a general conclusion as to the validity of the copyrights, and a general consideration of the use of those copyrights throughout the

entire series of the complainant's publications, lead just as certainly to the necessity of forming general conclusions with respect to the amount of material in the defendant's publications which can be traced to sources that were open to use by the defendant's writers, in comparison with the material from books in which the complainant still has an unimpaired ownership of the literary property. In other words, the determination of the issue of abandonment of copyright does not depend, in many of the phases of the question, upon the history of any particular copyright, nor its subsequent use; but all copyrighted material of a certain class which has been subjected to a similar use, or all copyrighted material which has been substantially found in unprotected works, must be considered as a whole, conclusions drawn as to its proportion to the work in the defendant's publications that must be held to have been taken from the complainant's books, and then the issue determined as to whether the amount of work so improperly taken constitutes a substantial and material portion of the entire volumes, and as well an indivisible portion of each volume. The question must then be determined whether, even if such portion be substantial, it be not controlled by the conclusions as to unfair use, in which it has been held that for some injuries to the complainant, and some benefits to the defendant, the remedy cannot be injunction, and as to those uses equitable relief will not lie in the present suit.

Various volumes and portions of the complainant's publications appear not to have been copyrighted, or some defect has been shown to exist in the method of recording the copyright, so that they can be dismissed from any question of unfair use, in that the complainant's rights thereto have been abandoned by publication, without proper precautions and compliance with the statute in so doing. The American Digest from 1900 to 1903 was freed to the world by the licensed publication under copyright of the General Digest for the same period. The Circuit Court of Appeals Reports and Digests, the Reporter Digests, and some digests of state reports were not copyrighted, and contain no copyright notice.

The entire series of Annual Digests prior to the year 1871 contained material as to which the copyrights have long since expired, and as to which such expiration had occurred at the time when the Enc. Pl. & Pr. and A. & E. Enc. Law (2d Ed.) were begun. The material from these old digests, comprising 31 volumes, with a number of old reports not digested in the previous volumes, was used by Mr. Abbott and his associates in making up the United States Digest, First Series, published in 14 volumes, from 1874 to 1876, at irregular intervals, and a separate volume containing a table of the cases in the previous 14. The classification of the matter, as has been said, was worked out by Mr. Abbott and his associates, and, beginning with the year 1872, a new series of Annual Digests, the first of which should have been published in the year 1871, commenced by Mr. Abbott, under the title of the "United States Digest, New Series." This work was published annually in one volume, under the direction of Mr. Abbott; and subsequently Little, Brown & Co., of Boston, Mass., commencing with volume 10, in the year 1880, began the publication of the work under

their own name and under their own registration of copyright. The United States Digest, New Series, was continued annually down to and including the volume for the year 1887, which was published as volume 18, and registered by Little, Brown & Co., in the year 1888.

At about that time the West Publishing Company, in connection with its reporter system, which had then been developed to a considerable extent, purchased from Little, Brown & Co. its title to the copyrights of the United States Digests, and the system was changed to a new series, starting with volume 1 of the American Digest, which also covered the decisions of the United States Supreme Court, the United States Circuit and District Courts, and the courts of last resort of all the states and territories, for the year 1887, and annually thereafter up to the date of the beginning of the present action. In order to perfect the title of the West Publishing Company to all of the rights of Mr. Abbott which had not been acquired from Little, Brown & Co., additional assignments were obtained from the children of Mr. Abbott, and thus the complainant became possessed of all property rights in the copyrights heretofore mentioned, which were transferable by assignment.

The American Digest was issued monthly in the form of advance sheets, called the "American Monthly Digest," following substantially the form of the advance sheets of the American Reporter System, then well under way. Each of these monthly digests was registered by title at Washington, and each number contained a statement of the copyright, substantially in the following form:

"The American Digest, United States Digest, Third Series. (Monthly Advance Sheets.) Copyright 18— by West Publishing Company."

The annual volume contained a similar notice, but with the date of the copyright that of the year in which the annual volume was issued, rather than of the year previous, during which the monthly digests had been registered and issued. The annual volumes were made up of the compiled or consolidated paragraphs of the monthly numbers, under the same classifications, headlines, and cross-references as had been used in the monthly pamphlets, and various paragraphs were substantially the same as the headnotes and syllabus paragraphs of the cases contained in the various volumes of the National Reporter System for the preceding year, with such revision and amendments as were necessary for the purposes of the digest.

In the year 1897 a new series was begun by the West Publishing Company, called the "American Digest, Century Edition," which was completed, registered for copyright, and put on the market at irregular intervals, until at the time of the beginning of this action 38 volumes had been completed; the thirty-eighth volume being registered in the year 1903. These 38 volumes purported to contain all decisions of American cases from the year 1658 to the year 1896, and the prospectus in the first volume stated that the digest would be completed in from 50 to 55 volumes, bringing the reports of cases down to a point connecting with the American Annual Digest for 1897, and substantially terminating with September 1, 1896.

When the first volume of the Century Digest was issued, the A. &
E. Enc. Law (1st Ed.) had been completed, the Enc. Pl. & Pr. had
advanced to publication of the ninth volume, and the A. & E. Enc.
Law (2d Ed.) had been begun, and had advanced to the fourth or fifth
volume.    The Century Digest contained the material of the digests
controlled by the complainant up to the year 1896, and the headnotes
and syllabi of the National Reporter System to the same time.    Each
volume of the Century Digest was registered for copyright, and the
volumes filed under a new copyright notice printed in each volume.

The testimony further shows that another publication was prepared
and issued by the West Publishing Company, called "Federal Cases,"
which comprised 30 volumes, issued between February, 1894, and
April, 1897, and contained all cases decided in the United States
courts, other than the Supreme Court, prior to the beginning of the
Federal Reporter, in the year 1880.    A digest of these publications,
called the "Federal Cases Digest," was issued in one volume, under
a separate notice of copyright, in the year 1897.    In 1900 a digest
of the Federal Reporters was made and published, covering the re-
porters up to that time, comprising 8 volumes, each registered and
filed for copyright, and containing a separate notice of copyright for
each volume.

An entirely different set of publications, called the General Digest,
was begun by the Lawyers' Co-operative Publishing Company, of
Rochester, N. Y., a corporation not connected with the West Publish-
ing Company.    In the year 1900, and after the termination of the
litigation between the West Publishing Company and the Lawyers'
Co-operative Publishing Company (in the suit reported in 79 Fed. 756,
25 C. C. A. 648, 35 L. R. A. 400), a license was granted to the Law-
yers' Co-operative Publishing Company to use the material of the
West Publishing Company, both from the Reporter System and from
the American Digest, and since that time the preparation of this di-
gest material for the General Digest has been made by the West Pub-
lishing Company, and in most instances what are known as digest
paragraphs were embodied in the General Digest and copyrighted,
volume by volume, in the name of the Lawyers' Co-operative Publish-
ing Company, in substantially the same form in which those para-
graphs appear in the digests of the American Series, and in the head-
notes of the reporter system.

In addition, the West Publishing Company have granted licenses to
various text-book writers, and to certain publications such as the Cen-
tral Law Journal, a periodical printed at St. Louis, Mo., and copy-
righted by the Central Law Journal, number by number.    Under this
license current decisions and digest paragraphs had been printed in the
Central Law Journal, in substantially the language and form of com-
plainant's reporter system and the American Digest, and this use con-
tinued until after the beginning of the present action.    A further li-
cense was given to Kinney's Illinois Digest and the Albany Law Jour-
nal, by which a similar use of the complainant's copyrighted material
was made, and copyrights, from time to time, were taken out by the

publishers of these works upon their books' as published, down to the date of the present action.

After the organization of the American Law Book Company, in the year 1900, and about the time of the litigation between that company and the Edward Thompson Company, considerable negotiations were had with the West Publishing Company, as a result of which the American Law Book Company was given the right to use the material of the West Publishing Company, in so far and in whatever way might be necessary, in the preparation and publication of the Cyclopedia of Law and Procedure, and that this publication has been copyrighted by the American Law Book Company, in its own name, volume by volume. A similar license has been granted to the Michie Co., of Charlottesville, Va.

It would be possible, therefore, to locate certain so-called digest paragraphs in the old United States Annual Digest, the United States Digest, First Series, and United States Digest, New Series, the American Digest, the Century Digest and the licensed publications of one sort and another. Some of the syllabus paragraphs of the Reporter System and of the corresponding digest paragraphs of the complainant's Monthly Digests could be traced and substantially located in the American Digest Annual, Century Digest, General Digest, Central Law Journal, the Cyclopedia of Law and Procedure, and some of the other licensed publications above referred to in each place being a part of a volume copyrighted under a separate title, and without reference to any preceding copyright. In addition, the syllabus paragraphs and index paragraphs of the weekly Reporters anticipate the volume Reports and Digests, and even the Monthly or Biweekly Digests, and in fact the first copyright of any particular paragraph will usually be found in a weekly number of some Reporter. Since the year 1883, practically all pamphlet numbers of the Reporter System and of the digests have been registered and filed separately as published, and the annual compiled volume has later been registered and filed in Washington, at the time of its completion and publication as a separate book.

It should be stated that the Reporter System has always been carried on in the form of advance sheets containing the decisions and headnotes in substantially the form of digest paragraphs, and with a partial index and collection of digest notes. The advance sheets of the first 14 volumes of the Federal Reporter were never filed by themselves for copyright, and some other early numbers of the Reporter pamphlets, such as the Northwestern Reporter before 1887, and volume 1 of the Pacific Reporter, were not filed until the volume was completed and filed by itself. The broad claim is made by the defendant that such use of copyrighted material has constituted an abandonment of the copyright upon every paragraph printed in more than one publication, and thus separately copyrighted, inasmuch as in no instance has one of the later volumes carried the notice of original copyright.

The New York Reports (official), which are printed in the form of advance sheets, separately copyrighted as published, and later included in a bound volume at the end of each year, also separately copyrighted, but containing in the annual volumes references to the sepa-

rate copyrights of the pamphlets, have been introduced in evidence as an instance of an attempt to prevent the loss of earlier copyrights by a republication of the various paragraphs in another copyrighted work; and while the court is not called upon to pass upon the sufficiency of this method, in order to determine whether the attempt at the preservation of copyright rights thus made is successful, the method used emphasizes and points the argument of the defendant in this regard.

It will be necessary to consider in this connection some decisions bearing upon the provisions of the copyright statute, as contained in section 4962, Rev. St. (U. S. Comp. St. 1901, p. 3411), which is as follows:

> "No person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published, on the title-page or the page immediately following, if it be a book, * * * the following words, 'Entered according to act of Congress, in the year ——, by A. B., in the office of the Librarian of Congress at Washington,' or 'Copyright 18— by A. B.'"

And it will be necessary to determine with respect to such portions of the work as have been generally called digest and syllabus paragraphs in this suit, what constitutes a later edition, and whether or no the protection of the copyright notice, and the title of the author or person entitled to the copyright, is lost when such paragraphs are embodied in a subsequent work, with no reference made to the original copyright; that is, where no copyright notice of the original work is printed in connection with the later use of the article.

The case of Lawrence v. Dana, supra, decided in 1869, discussed the language, "No person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published" the date and name of the owner of the copyright. The Supreme Court held that a new edition, which was in effect a revision with original work, was not an edition of the old book, and did not need to contain a republication of the original notice of copyright. But the court was there passing upon the scope of the copyright of the new work, rather than whether the old material was released by an unauthorized or infringing publication, in which new material could be copyrighted by itself. In Mifflin v. R. H. White Company, 190 U. S. 260, 23 Sup. Ct. 769, 47 L. Ed. 1040, and Mifflin v. Dutton, 190 U. S. 265, 23 Sup. Ct. 771, 47 L. Ed. 1043, as well as in Holmes v. Hurst, 174 U. S. 82, 19 Sup. Ct. 606, 43 L. Ed. 904, the development of this idea further established the meaning of the statute. In Holmes v. Hurst, Dr. Holmes endeavored to prosecute the publication of his book "The Autocrat of the Breakfast Table," and the defense was interposed that the copyright had been lost, in that the entire book had been published in serial form in numbers of the Atlantic Monthly, without notice of copyright of the novel, and that the later book, in one volume, had been published and copyrighted by Dr. Holmes with the statutory record and printing of the notice. The Supreme Court there says that it had then become the settled law, in this country and in England, that the right of an author to a mo-

nopoly of his publications is measured and determined by the copyright act; in other words, that, while a remedy did exist at common law, it has been superseded by statute. Following the case of Wheaton v. Peters, supra, the court decided that Dr. Holmes had lost his copyright through the failure to comply strictly with the statutory requirements.

In Mifflin v. R. H. White Company, supra, "The Autocrat of the Breakfast Table" was again the work under consideration. It appears by this decision that ten of the monthly parts had been published in the Atlantic Monthly without any notice of copyright. The last two parts were printed in numbers of the magazine which carried a notice of a copyright of the magazine by its publishers, and the court there based the decision that the copyright had been lost, upon the theory that the object of the copyright notice was to warn the public against making use of the works of an author, and, the remedy being statutory, the public had the right to demand that the requirements be strictly complied with, for which reason the court held that the entry of a book under one title, by the publishers, could not be called to the aid of an entry of a different book, with a different title by another person, even when portions of each book were alike.

In the case of Mifflin v. Dutton, supra, the "Minister's Wooing," by Mrs. Harriet Beecher Stowe, was the subject of the case. It appeared that, of the 42 chapters, 29 had been published in the Atlantic Monthly, without notice of copyright. The last 13 had been included in the numbers of the magazine, each copyrighted by the publishers of that magazine. But the book as a whole was published between the appearance of the first 29 chapters and the appearance of the last 13. The court held that the copyright attempted to be taken out by Mrs. Stowe for the entire book was invalidated as to the first 29 chapters, in that these chapters had been previously printed in the Atlantic Monthly without copyright notice, and her rights to the remaining portion of the book—that is, the last 13 chapters—were lost by her acquiescence in and permission to the magazine to publish that part of her work, without repeating the notice of her copyright, under the provisions of section 5 of the statute then in effect (Act Feb. 3, 1831, 4 Stat. 436, c. 16), requiring an insertion in the several copies of each and every edition published during the term secured of information by the appropriate notice of the copyright.

Applying these principles to the present case, we find that the effect is extensive in several respects. As has already been indicated, the copyright upon a number of individual volumes was never perfected, for reasons heretofore pointed out; but as to a much greater number of volumes the copyright upon the language of the headnotes, the digest paragraphs in the index, the black-letter headlines, and, in the case of the digest advance sheets, the entire material of those pamphlets, was lost by the publication of the pamphlet numbers in advance of the completed volume, unless such result was obviated by the deposit of the various titles in the name of the same owner of the copyright. It is evident that the public would not be misled as to the name of the author, nor as to the identity of the person who

claimed the copyright, because of two notices, one indicating a pamphlet portion, and the other the completed volume, but both belonging to the same corporation. Nor would the public be wronged by the claim of that corporation that it had recorded the proper title each time that it had published a book or an edition of a previous book. But the public, and any person interested in the right to use the copyrighted material, would certainly be wronged, even to a slight extent, by a notice that, for instance, "in the year 1886, volume 1 of the Atlantic Reporter was entered for copyright," while twelve-fourteenths of that book, or the first 12 of the 14 pamphlets of which it was made up, had been entered for copyright and filed at different periods during the year 1885.

This brings the case within the doctrine of Baker v. Taylor, 2 Blatchf. 82, Fed. Cas. No. 782, where printing the date 1847 in mistake for 1846 caused loss of the copyright, rather than the doctrine of Callaghan v. Myers, supra, where the mistake in printing of a slightly earlier date was held to estop the publisher, but to be immaterial as to the validity of the copyright.

Surely the printing of a bound volume containing the entire contents of a copyrighted pamphlet is the printing of a later edition of that pamphlet, and this proposition runs through the entire series of the Reporter System and series of American Digests. As to some of them the question is simplified by the fact that the date of the copyright of the entire work is later than that of the copyright of its parts, and a search in the office of the Librarian of Congress at Washington, or in any other place, for the recorded title of the complete work, would mislead as to the date upon which copyright of the various portions would expire.

But in some instances such as the later numbers of the Federal Reporter, and certain of the other reporters, the copyright notice of the volume has been entered at Washington in the same year as that of the pamphlet numbers, or the greater portion of the pamphlet numbers, contained in that volume, and the notice, therefore, of the title, in so far as the portion of the title-page is material, and the printed notice carried in each subsequent copy of the book, would be the same for the whole or the greater part of the book.

It does not need much argument to support the conclusion that even in such a case the printed notice must comply with the statute; but it is with much greater difficulty that any reason can be found for holding that a title-page, say, of the "Federal Reporter, Vol. 150, No. 2, Copyright 1907, by West Publishing Company," with other particulars, and with the usual contents, would not be described as well as the other numbers, from 1 to 5 or 6, printed in that volume, in the notice of copyright printed in the completed volume, under the words "Copyright 1907, by West Publishing Company."

We therefore find that in some instances the complainant seems to have, almost by chance, published its books in such a way that the recorded titles complied with the statute in some instances, but in more instances that they did not. And it follows as a corollary that, if the West Publishing Company intended to copyright all of the original material contained in its pamphlets, it should have taken pains to see

that any book containing those pamphlets as a whole contained also an indication of when the copyright upon each pamphlet was obtained, and the period of exclusive enjoyment set in operation.

But, the question does not stop here. In the United States Digest, First Series, most of the material, as has been said, was taken from the earlier digests and from official reports. The paragraphs were republished from either old or copyrighted publications. The United States Digest, New Series, was, to a large extent, made up from syllabi and headnotes, either official or as to which permission for the use of which had been granted. Yet each volume of these digests was registered and filed for copyright, with a notice of copyright applying to the whole volume. The American Digest, the Federal Cases Digest, and the Century Digest contain, not only many paragraphs and syllabi which are in substance official or copied from the opinions, but have collected under the various headings the total paragraphs, as printed under those same heads in the Reporters and the advance sheets of the digests themselves.

It is contended by the complainant that no one paragraph can be called a subsequent edition of an entire book or pamphlet number of an annual digest, and that the doctrine of Mifflin v. Dutton, supra, in which the 13 final chapters, when printed in serial form, were held to have invalidated that portion of the complete book, is controlling. On the other hand, the defendant contends, not that each paragraph is necessarily a new edition, but that if the complainant made use of all the paragraphs—that is, substantially all of the contents of a copyrighted book—in the course of making up a new book, which is likewise to be copyrighted, and as to which only the original literary material is entitled to copyright, it must in some way indicate its indebtedness to the original copyrighted work, or must inform the public that that copyright is not abandoned; for otherwise, if the subsequent publication be authorized, the public would certainly seem to be entitled to assume that the material not original with the later publications had been released.

It is impossible to draw a hard and fast line between the use of one paragraph, which could hardly be called by itself an "edition," and the use of a portion of a book containing paragraphs enough so that it would constitute an edition. The true test would seem to be that, from the standpoint of the entire book, an edition could be any divisible part of which the copyright could consistently be entered by itself; while, from the standpoint of an individual paragraph in a copyrighted book, a subsequent edition would seem to be any such portion of the book as might be consistently held suitable for copyright, if this included the paragraph in question.

From this it will be seen that no one paragraph, when reprinted in a different volume, should of itself be considered an edition of the entire original volume, nor should an entire subsequent volume be considered merely an edition of some one paragraph in an earlier copyrighted publication. But if any appreciable portion—that is, such portion as would indicate a use of the material of the earlier publication—is included in the later work, it seems necessary to hold that

the later work should carry a notice of the earlier copyright, with a sufficiently definite clue to inform the reader of all copyrights whose existence was not intended to be destroyed or circumscribed by the publication of the later work.

Suppose a person should copyright a cook book, with a great number of recipes collected from various sources, and it should be assumed that in most instances the recipes had been rewritten and formulated in such manner as to entitle them to copyright, and then suppose that permission were given to various social organizations, newspapers, and advertising media to print from one to a large number of the recipes previously copyrighted; would a new copyright upon the newspaper or advertising publication, even if original work had been bestowed thereon, afford any protection to the recipes which might be so reprinted? And would a person then assuming the right to embody the same recipes in other books, or in a later cook book, be liable to infringement of the original copyright, when he could have no warning or notice of its existence? Would the plea that he should have known that any one recipe was not sufficiently an edition to require notice of copyright put him upon guard and compel him to search all the copyrighted cook books to protect himself against a suit for infringement? And especially if he knew that the recipes were not the original work of the person holding the later copyright?

The copyright law provides that "no person shall be entitled to a copyright unless he shall * * * deliver * * * or deposit a printed title * * * and two copies of such copyright book," etc. Section 4956, Rev. St. (U. S. Comp. St. 1901, p. 3407). As has been said, since the existence of this statute, rights may be acquired thereunder, and the common-law right of property in literary material is superseded by the right acquired through compliance with the statute. This statutory right is defined by section 4952, Rev. St. (U. S. Comp. St. 1901, p. 3406), to be "the sole liberty of printing, * * * publishing, * * * copying, * * * and vending the same," or, as it has been called, "of multiplying copies."

A property right to the material is thus assured, and apparently as an outgrowth of the necessities of the case, and in some manner from the doctrine of "unfair competition," the words of section 4967 (U. S. Comp. St. 1901, p. 3416), to wit, "Every person who shall print or publish any manuscript whatever," have been applied in the case of copyrighted works to the use of any material part. The words "animo furandi" have been treated as meaning "with intent to make use," rather than "with intent to unlawfully appropriate," and the decisions have not regarded a mistaken idea of right as a legal defense. But when the courts have taken up the consideration of section 4962, requiring a notice of copyright in every copy of every edition, they have apparently decided that a book containing new material with the old was not a new edition, unless it was merely a reprint of the original book. Banks v. McDivitt, supra; Lawrence v. Dana, supra. The complainant argues that the cases of Mifflin v. R. H. White Co., supra, Mifflin v. Dutton, supra, and Holmes v. Hurst, supra, are not cases of abandonment of copyright, but are illustrations of how a copyright may

169 F.—56

never be secured through failure to comply with the statutes. This is true; but the failure to obtain a copyright was because the author abandoned the right to copyrightable matter, either before attempting to take out copyright or after so doing, by allowing a publication which prevented any action for infringement. So in this case. the printing of an entire copyrighted pamphlet in an annual publication, which was merely a compilation of the various numbers, would seem to be an act which would require a strict compliance with the statute, and hence require a notice of the copyright which should be relied on for the protection of such material as was not open to a new and different · copyright in the later work. If the last chapters of Mrs. Stowe's work had been recopyrighted by herself in a different year, would she have been better off than when they were copyrighted by some one to whom she had given the right to take such action?

If the material in the annual publications of the complainant was released, in that the old copyrights were not mentioned, what benefit can be claimed because those old copyrights were the property of the complainant itself? What hardship would be involved in printing after the title-page of the annual or compiled volume a statement of the copyrights which were included as new editions in the united volume? Suppose a monthly magazine should be issued in bound form at the end of the year, and that each department, such as "Fiction," "Editor's Table," etc., should be put together, and the various numbers thus interleaved or interlaid; would that free the publishers from repeating the copyright notice of each "monthly"?

But the questions arising from the use, under a license, of copyrighted material, assuming that the copyrights have been consistently preserved, presents even clearer illustrations, but depending upon essentially the same propositions. Such a use of an entire year's copyrighted material, as is made by the publishers of the General Digest of the paragraphs contained in the pamphlets of the American Digest for the preceding year, and of substantially the copyrightable material in an entire year's issue of the Federal Reporter, when transferred into the form of digest paragraphs, can be justified only upon the theory that the license used is equivalent to the use of the proprietor of the copyrights themselves. But from the standpoint of the public, or of any one endeavoring to observe the proprieties of legitimate use, the licensed publication would certainly give no information by which that person could be apprised of the original copyrights, and such use would seem to constitute a liberation of the original material. If the strict rights of protection against infringement are provided for, by the payment of royalties and the obtaining of a license, surely the public is entitled to know what rights must be respected, and what property can be indiscriminately used. So the giving of license rights to authors and publishers of text-books (while perhaps it should not · cause termination of copyright; if the use be so limited as to indicate quotation, rather than republication), to publications like the Central Law Journal and Kinney's Illinois Digest, would seem to be in the light of a sale of the labor represented by the copyrighted material, and to be an abandonment of the exclusive right of publication, unless ·

the terms are such as to insure an insertion of the appropriate copyright notices, whenever the use approaches the extent of what could be considered an edition. Within the rule which has been adopted herein, the Central Law Journal, Illinois Law Notes, and the text-book collections of citations and authorities, would seem to be sufficiently editions of copyrightable and copyrighted material as to throw upon the complainant the burden of insisting that its copyrights be recited, when a substantially verbatim use of that copyrighted material was embodied in printed form and transmitted to the publisher.

The ordinary text-book and the Cyclopedia of Law & Procedure stand in a somewhat different position, and to a great extent the latter work can hardly be called an edition of the copyrighted material of the complainant's publications, except in so far as its footnotes may follow the digest paragraphs and syllabus headnotes of the complainant's books. But the fact that licenses have been granted to these publications, and that they have been allowed to make public, under their own copyright, such portions of the complainant's copyrighted books as the authors of these other publications may find necessary, without any attempt on the part of the complainant to compel insertion of notice of copyright, would indicate that no attempt was made by the complainant to prevent the destruction of its copyrights, if the use which might be made of the material should be extensive enough and in such form as to invalidate the copyrights affected, and form an additional argument why the defendant should not be enjoined in equity in the present action, because of the use of such materials as may have been released from the original copyrights, in the methods which have been indicated.

It can make no difference whether the defendant instructed its writers to avoid generally the use of the copyrighted material of the complainant, or of any other person, and in spite of such instructions a greater or less use was made by the various writers, provided this use ultimately proves to have been with relation to matter as to which the copyrights have been lost or invalidated. Such a result may not have been intended; but the defendant would be in the same position as if it had been able to investigate beforehand each paragraph so used, and to determine for itself that it was entitled to use it. It may be said that its escape from liability was unintentional, but the act must be judged by the facts, rather than whether such use was inadvertent or deliberate and premeditated; and equitable relief as to such matters would be no broader than legal damages, for both must depend upon the violation of legal rights, and such violation does not seem to have existed to any appreciable extent.

The complainant has made considerable point throughout the case of the fact that the defendant's editors and revisers struck out all citations and references in the complainant's Reporter System, wherever the citation from the official reports could be substituted. If the material thus attributed to another source had been found to be exclusively the property of the complainant, in the form in which it was used, and if the complainant's rights thereto had not been lost or appreciably affected, such evasion of attributing the paragraphs to the

sources from which they were obtained would be a strong argument against the defendant's good faith, and also against the defendant's claim that its use was not unfair. But if the defendant is fortunate enough to escape the effects of what might thus be considered unfair use, in that it has been able to show that it would have been entitled to do what it did do with impunity, it is not to be punished by injunction, when it could not be so punished if it had been in the possession of knowledge of all the facts, and had deliberately reached the same conclusion.

An examination of the many parallel column exhibits and marked exhibits introduced by the complainant, and comparison of these exhibits with the parallel column and marked exhibits introduced by the defendant, show that the number of instances where the paragraph or list of citations in the defendant's publications, by similarity of language or conjunction of words, or even literal copying of mistakes, cannot be explained and justified by the presence of the same paragraphs and language in other publications, either official or licensed, or republished with an accompanying abandonment of copyright, is comparatively insignificant and immaterial. The number of instances, as well, in which copying or paraphrasing for similar reasons must be presumed, and in which such use would necessarily be held unfair, in that the literary labor of the complainant, or its assignors, must be held to have been taken advantage of, and as to which a similar explanation or justification is not shown in the parallel column exhibits of the defendant, is also insignificant and immaterial in comparison with the total number of exhibits involved. Even in such articles as the subjects of "Patents" and "Intoxicating Liquors," the number of paragraphs upon which the complainant can claim relief, within the limits of this decision, is small and of insufficient amount, in comparison with the entire articles, to justify injunctive relief, and these conclusions are practically controlling upon the entire questions involved in the present action.

The defendant has raised the question of laches on the part of the complainant in bringing the present action. This particular defense raises the same question which has previously been considered, in that the action involved 74 separate printed volumes of the defendant's company. These were issued, as has been shown, through an interval of some 15 or 16 years, and each volume, or even the separate articles, subject by subject, in these volumes, might have been made the basis of a suit at any time after its issuance. Any such separate action would have disposed of the greater part of the questions involved in the present action, and would have presented a simple issue in comparison with the one at bar. The A. & E. Enc. Law (1st Ed.) presented a much plainer field for the investigation of alleged infringements and allegations of unfair use than did the later publications. The first volume of the A. & E. Enc. Law (2d Ed.) contains much more material which calls for explanation by the defendant than any of the subsequent volumes taken as a whole, and this book was published in the year 1896.

The testimony shows that as early as 1893 some discussion was had between the directors of the complainant, over a suspicion, as it is termed, that the Edward Thompson Company was making use of copy-

righted material belonging to the complainant. But an examination at that time did not reveal anything from which the complainant was led to institute an action, but, on the contrary, its conclusion was that litigation was not justified upon the information which it had. The suit between the Edward Thompson Company and the American Law Book Company (without considering its effect from the standpoint of motive) seems to have incited an investigation in the year 1902 leading to the bringing of the present action; while a visit made by Mr. Ames, vice president of the complainant, in 1900, to the defendant's plant, seems to have put him in possession of information from which he derived impressions which at least contributed to the later determination to bring suit. The details of this interview are variously stated. The defendant's witnesses relate the incidents of the conversations with Mr. Ames in such form as to indicate that Mr. Ames either found nothing of which he openly disapproved, or that he concealed his impressions over his discoveries, from any of the persons who were called as witnesses by the defendant.

Be that as it may, the present suit was instituted soon after the decision of the litigation referred to; and it also appears that at some time substantial, if not majority, interests in the American Law Book Company have been acquired by officers and stockholders of the West Publishing Company. Even without imputing any improper motive, it is plain that the interests of the complainant were involved in a substantially different way, when the field of sale was being covered by the A. & E. Enc. of Law and the Cyc. as competing publications. For this reason there is more force to the defense of laches with respect to the books printed prior to the year 1902 than might be found in a similar defense if it had been raised in any action instituted before that time. The lapse of time since the witnesses wrote, the loss of their manuscript in most cases, and the scattering or change of employment of the writers themselves, all adds to the force of the argument based on the proposition of laches in the sense of delay in bringing action.

The complainant is shown to have exchanged various publications for the defendant's Encyclopedias, and to have resold its Encyclopedias. For a number of years the advertising matter of the complainant and of the defendant indicated a rivalry and conflict between the digests, particularly the Century Edition and the defendant's Encyclopedias. But by degrees it became apparent that the digest was of value to a certain class of customers from one standpoint, while the Encyclopedias were of value to customers who desired books from a somewhat different standpoint. It would be hard to determine whether the Encyclopedia interfered more with the sale of the digests, or of the reports themselves, inasmuch as the Encyclopedia purported to cover the entire field up to the time of its issue. If the Encyclopedias had contained citations to the complainant's reports, it would have an effect which cannot now be estimated upon the question of "fair quotation," and of acquiescence on the part of the complainant in the defendant's acts.

But the use which was made by the defendant of the material in the complainant's works, nominally covered by its copyrights, was in the

form of paraphrasing, or of adaptation by mental recollection; and the lack of citation to the complainant's works, which would be equivalent to "quotation," as a clue to the source of the material, renders the defense of acquiescence of so slight importance as to leave it nothing more than an argument in connection with the defense of laches. The advertising matter of the complainant, and its entire course of action, is consistent with the idea that it did not arrive at the determination to bring an action until the time at which the present action was brought. But none of these acts are equivalent by themselves, or even taken collectively, to admissions which would estop the complainant, or would be equivalent to substantial approval of the matters now complained of in this action.

The defense of laches, involving loss of testimony, witnesses, and definite recollection of events, implies a negative course of action; that is, a failure on the part of the complainant to do what it was called upon to do, if its property rights had been injuriously invaded in a way of which it should have had knowledge at a time so long previous to the present action that it must be declared not entitled to equitable relief because of that negligence. But the defense of acquiescence is affirmative, and in so far as it means deliberate or conscious approval, even with some mistaken idea of the law, it does not, as has been said, rise in the present instance to the level of doing more than to throw some light upon the question of the other defenses.

The complainant asserts that the defense of laches is not applicable to rights accruing through infringement of patents, trade-marks, and copyrights, where further continuance of a wrong could be prevented by an injunction—citing McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526; Saxlehner v. Eisner & M. Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60, and other cases. It urges the distinction based upon "executory," in opposition to "executed, interests," as defined by Clark v. Hart, 6 H. L. Cases, 633, and in Galway v. Metropolitan El. R. Co., 128 N. Y. 132, 28 N. E. 479, 13 L. R. A. 788, and Richardson v. Green, 61 Fed. 423, 9 C. C. A. 565, and contends that, as in Hutter v. Koscherak (C. C.) 137 Fed. 92, the defenses of laches and estoppel are the same, as far as they are applicable to the present action. It is unnecessary to seek any line of distinction, for the court agrees with the complainant's propositions in this regard, and it does not appear, as has been said, that these affirmative defenses, arising out of delay alone, could, independently of the other questions, determine this action.

These propositions have been referred to, not that any one of them is controlling, nor that this present action can be decided, or should be decided, solely upon any of these issues of laches or lack of equity in the complainant's own position; but, when considering the extended period which the scope of the action covers, and the impossibility of applying the more definite issues of infringement and the validity of copyright to any accurate portion of the alleged infringement, and bearing in mind the decision in the Circuit Court of Appeals in the case of West Publishing Co. v. Lawyers' Co-operative Co., supra, by which the burden is thrown upon the defendant of particularizing and prov-

ing affirmatively the title to every part of the books involved in the suit, as to which an injunction may not run, these defenses are cumulative and persuasive to the court in reaching the conclusion that equity does not demand an injunction against any part of the defendant's publications.

An adequate remedy at law existed for any damages which could have been proved, and. an accounting for profits cannot be ordered herein.

Bill dismissed, but without costs.